Santos H. CRUZ, Appellant,

v.

STATE of Texas, Appellee.

No. 13–81–039–CR.

Court of Appeals of Texas, Corpus Christi.

Feb. 18, 1982.

Discretionary Review Refused May 26, 1982.

Robert A. Whittington, O'Leary, Sanchez & Benton, Brownsville, for appellant.

Reynaldo Cantu, Jr., Criminal Dist. Atty., Brownsville, for appellee.

Before BISSETT, YOUNG and GONZA-LEZ, JJ.

## OPINION

BISSETT, Justice.

Santos H. Cruz was convicted of capital murder under Tex.Penal Code Ann. § 19.-03(a)(2) (Vernon 1974).[1] Trial was to a jury. Punishment was assessed at life imprisonment in the Texas Department of Corrections. We reverse and remand.

The indictment, in substance, alleged that Santos H. Cruz (defendant-appellant), on or about September 25, 1978, in the County of Cameron, State of Texas, did intentionally and knowingly, while in the course of committing robbery of Amador Balderas Salinas, cause the death of Amador Balderas Salinas by shooting him with a gun. The court's charge, in pertinent part, reads as follows:

"[i]f you find from the evidence beyond a reasonable doubt that on or about the 25th day of September, 1978, in Cameron County, Texas, the Defendant, Santos H. Cruz, did intentionally or knowingly cause the death of another person, to wit, Amador Balderas Salinas, by shooting him with a gun and that the said Santos H. Cruz, was then and there in the course of committing, or attempting to commit, the offense of robbery of Amador Balderas Salinas, of his property, then you will find the Defendant guilty of Capital Murder . . ."

Since we reverse the judgment of the trial court, we do not deem it necessary to discuss or decide the questions presented by grounds of error one, three, four, five and seven. We, therefore, limit our discussion and decision to grounds of error two and six.

■ The appellant, in ground of error two, asserts that the trial court erred in ruling that his statement, or confession, was admissible in evidence. He argues that the statement was not voluntarily given and that he was not properly advised of his constitutional and statutory rights prior to signing the statement.

The record reveals that the appellant shot and killed Amador Balderas Salinas on September 25, 1978. The appellant was taken into custody on September 26, 1978. He made and signed a statement while in jail on September 27, 1978. With respect to the contention that appellant was not properly advised of his constitutional and statutory rights, the statement, which was made to Cameron County Deputy Sheriff Roy Zepeda, reads as follows:

"I, Santos Herbert Cruz, having been warned by Roy Zepeda Deputy, whose occupation is a Deputy Sheriff, at o'clock 11:00 a. m., on the 27th day of September, 1978, at Brownsville, Cameron County, Texas, (1) that I have the right to remain silent and not make any statement at all and that any statement that I make may be used against me at my trial or trials; (2) that any statement I make may be used as evidence against me in court; (3) that I have the right to have a lawyer present to advise me prior to and during any questioning; (4) that If I am unable to employ a lawyer, I have the right to have a lawyer appointed to advise me prior to and during any questioning; and (5) that I have the right to terminate the interview at any time. I understand all of my rights as stated above, and now that I know my rights it is my choice to voluntarily give them up and to freely, intelligently, and knowingly make the following statement."

\* \* \* \* \* \*

"I, Luis G. Martinez, Jr., do hereby certify that I have translated the foregoing statement from English to Spanish to the above named person Santos Herbert Cruz, and that he has signed it with the same full knowledge and understanding of its contents and legal effects."

Following a hearing on the appellant's motion to suppress the statement, the trial court, over the appellant's objections, ruled that the statement was admissible.

1. All statutory references are to Tex.Penal Code Ann., unless otherwise stated.

The inculpatory portions of the statement were introduced in evidence by the State. In those portions of the statement, the appellant said that during the early morning hours of September 25, 1978, upon his return from Harlingen, Texas, to the house where he lived, and after a conversation with one of the men who also lived in the house, "I then pulled out my gun and shot him."

The exculpatory portions of the statement were introduced in evidence by the appellant. The appellant, in those portions, said:

"The men told me where was the other men; I told him that he stayed behind with a girl. He told me you better bring him to me now, that's when he told me: 'Chinga tu Madre.' I went to his room and I told him why he said 'Chinga tu Madre.' The man swung at me with a hammer. I then pulled out my gun and shot him."

Roy Zepeda testified that on September 27, 1978, he took the appellant's statement. He further testified that prior to taking the same, he read the rights to the appellant which are set out at the very beginning of the statement. He said that those rights were read by him to the appellant in both English and in Spanish. According to Officer Zepeda, the appellant understood these rights.

After the statement was typed, and before the appellant signed it, the statement, including the rights contained therein, was once again read to him in Spanish by Officer Zepeda and also by deputy sheriff Luis Martinez. Again, the appellant indicated he understood his rights and appellant then affixed his mark to the confession, which was witnessed by Officer Zepeda and by Julio Martinez, a deputy sheriff, who translated the confession, as written in English to Spanish, to the appellant, including the warnings at the top of the confession, and the appellant stated to Officer Martinez, in Spanish, "Si, entiendo," which Officer Martinez testified means, "I understand." At no time did appellant ask for a lawyer.

Oscar Leal, a deputy sheriff of Cameron County, testified that, at the request of the District Attorney's office, he took the statement (after it had been reduced to writing in English) back to the appellant to be re-translated from English to Spanish to the appellant, and to be re-signed by him in the presence of a non-officer witness. This was done on October 25, 1978. Officer Leal read the confession, including the warnings thereon, to the appellant in Spanish. The appellant told Officer Leal that he understood his rights. Officer Leal then asked him if he wanted to re-sign the confession and appellant made his mark thereon once again. Officer Leal further testified that at no time did the appellant request an attorney and, further, that the appellant understood what he was doing and did so voluntarily.

Yolanda Delgado, a secretary for the Sheriff's Department of Cameron County, testified she was not a police officer. Her signature was affixed to the statement as a witness thereto on October 25, 1978. She said that on that date, Officer Leal, in her presence, read the warnings from the statement to the appellant; that the appellant said that he understood the warnings; and that Officer Leal told the appellant that he did not have to sign the statement. She further stated that the appellant was then asked if he wanted to sign the statement; and that he then picked up a pen and again made his mark.

The appellant, at the hearing of his motion to suppress the statement, testified that he understood his rights to have a lawyer appointed and present during the taking of the confession, as well as his other rights.

We find that the appellant, at all pertinent times incident to the making and signing of the statement, was given all of the required warnings. On each occasion he indicated that he understood the warnings given to him. He did not, at any time, request that a lawyer be appointed to advise him of his rights nor did he attempt to retain the services of a lawyer. We further find that the statement was made voluntar-

ily and that the appellant understood what he was doing when he made the statement and when he signed and re-signed the same. The trial court did not err in ruling that the statement was admissible or in permitting portions thereof to be read into evidence by the State (and by the appellant).

The appellant, in ground of error six, contends "that the evidence was insufficient to establish all elements of the offense alleged beyond a reasonable doubt." We agree.

In order to sustain the conviction for capital murder in this case, it was incumbent upon the State, pursuant to the provisions of Tex.Penal Code Ann. 19.03(a)(2) (Vernon 1974), to prove beyond a reasonable doubt that:

(1) the defendant

(2) intentionally

(3) caused the death of the deceased

(4) while in the course of committing a robbery of the deceased.

The intentional killing of the deceased by the appellant was established by direct evidence. However, the evidence relating to the element that the killing was in the course of committing robbery of the deceased by the appellant is purely circumstantial. The trial court charged the jury on circumstantial evidence.

■ A conviction will not be sustained if the evidence, direct or circumstantial, is insufficient to establish *all* material elements of the offense with which the defendant is charged. *Culmore v. State*, 447 S.W.2d 915 (Tex.Cr.App.1969); *Ysasaga v. State*, 444 S.W.2d 305 (Tex.Cr.App.1969).

On September 24, 1978, the appellant was living in a small house on the Troy Myers Ranch, which is located approximately 2 ½ miles north of Harlingen, Cameron County, Texas. Living in the house with him were the deceased and Juvencio Salinas, a cousin of the deceased.

All three men worked on the ranch for Mr. Myers. The deceased had worked for Mr. Myers for approximately three weeks prior to the date of the shooting; Juvencio had worked for approximately 3 ½ months,

and the appellant had worked for approximately seven or eight years.

At approximately 4:00 o'clock on the afternoon of September 24, 1978, the deceased went into town (Harlingen) to purchase some beer. He returned from town with nine beers, which he and Juvencio began to drink. While they were drinking the beer, they prepared supper. After eating supper and after having drunk three beers each, the appellant appeared on the scene. He appeared to be drunk and was holding a pistol in his hand, which he brandished before the deceased and Juvencio. He then asked for a beer which .was given to him. After finishing that one, he drank a second beer and Juvencio drank his fourth beer. The appellant then invited both the men to go into Harlingen, Texas, to a bar, but the deceased refused the invitation. Juvencio and the appellant proceeded to the Los Compadres Bar in Harlingen, Texas. They entered the bar and Juvencio ordered a beer for himself and for the appellant. Juvencio then invited a girl to dance and after dancing with her for some time, sat down with her and drank some beer with her. After talking with her for some time, he got up to return to the table where he had left the appellant, and noticed that the appellant was no longer in the bar. Juvencio then returned to the girl whom he had been sitting with and remained at the bar with her for approximately an hour. He then went to another bar with the girl, and finally spent the night with her at her apartment.

The next morning at approximately 7:30, Juvencio called a taxi and was driven back to his home on the Myers Ranch. Upon his arrival, Juvencio found that the door on the south end of the house was locked. He looked through the window located on the southwest corner of the house and saw the deceased lying on the floor in the southwest corner dressed in a pair of underwear shorts. There was blood on and around the body. Juvencio called out to the deceased, but the latter did not respond. Juvencio then went and got Mr. Myers. Neither man went into the house but simply looked

through the window. Mr. Myers then called the police.

When the police arrived on the scene, they discovered that Amador Balderas Salinas was dead. The room was in a messy condition. The body was in the southwest corner of the room in which the deceased and Juvencio slept. The deceased's cot was located parallel to the north wall of the room.

According to the testimony of Juvencio, the deceased's clothes were on his cot. Juvencio went through the clothes (in the presence of the officers), searching for his cousin's belongings. According to his testimony, the deceased had purchased an Inca brand wristwatch from the appellant about eight days before the shooting. At night, the deceased would hang his clothes on a nail on the wall. He kept his personal belongings and "jewelry" in his clothes. Juvencio did not find the watch in the deceased's clothes, nor did he find any money, American or Mexican, on the deceased's person, or in his clothing, or in the room. According to Juvencio, the deceased had about $40.00 in American money the night before. The men had been paid two days previously. Juvencio was paid $135.00; the deceased was paid approximately $90.00; and the appellant was paid approximately $40.00. Following that payday, Mr. Myers took all three men into town to purchase groceries and clothing. The deceased purchased several pairs of pants and shirts along with some groceries.

During the officer's examination of the room where the body was found, he discovered a .22 caliber empty shell casing near the deceased's cot and three empty shell casings in the vicinity of the body. One unspent cartridge was discovered in the kitchen area outside of the room where the deceased's body was found, and another unspent cartridge was discovered in the vicinity of the body.

An autopsy was performed on the body of the deceased by Dr. James Mayor. One wound was in the left cheek. Another was a slitlike wound on the chest. Another was a penetrating wound through the wrist.

Finally, there was a wound caused by a bullet that traveled through the right base of the neck, downward through the neck lodging near the eighth rib. According to Dr. Mayor, the last wound mentioned caused the death of Amador Balderas Salinas.

The appellant was arrested by Officer Leal in Harlingen, Texas, approximately one-half mile from the Myers Ranch. Officer Leal testified that he saw the appellant bending down in a grass area near the place where he was arrested. On investigating the area, Officer Leal found a .22 caliber pistol and a bag of .22 caliber bullets. The appellant was taken into custody and transported to the Cameron County jail in Brownsville, Texas, where he was searched. An Inca brand wristwatch was found on his person along with slightly over $5,000.00 in Mexican pesos and $191.00 in American money.

The appellant, in support of his contention that the evidence is insufficient to establish all of the elements of the offense of capital murder, argues 1) that the evidence is insufficient to show that a completed theft of either money or the wristwatch took place, and 2) that the evidence is insufficient to establish that a robbery was committed by him.

■ To authorize a finding of theft in this case, the State was required to prove the following facts:

(1) a person, namely, the appellant

(2) exercised control over

(3) tangible personal property, namely, a wristwatch or money

(4) that was owned by or in the possession of the deceased

(5) without the consent of the deceased, or with consent of the deceased that was induced by a threat to commit an offense, and

(6) with the intent to withhold the watch or money permanently from the deceased.

■ Where possession of recently stolen property is relied upon for conviction of

theft, the State must show that the property in the defendant's possession is the identical property taken from the scene of the theft. *York v. State*, 511 S.W.2d 517 (Tex. Cr.App.1974),

■ At the outset, we agree with the appellant that the evidence is insufficient to show theft of money from the deceased because the State failed to show that the money which was found on the person of the appellant was the identical money that had been in the possession of the deceased prior to, during or following the killing. *York v. State*, supra.

Concerning State's Exhibit 7, a wristwatch, Juvencio, when asked if he could identify it, replied:

"This watch belonged to my cousin (the deceased). He bought it from Santos (the appellant)."

State's Exhibit 7 was introduced in evidence without objection.

■ The testimony of Juvencio Salinas and appellant's recent unexplained possession of the watch are sufficient to support a finding that the State proved all of the elements of theft of the watch.

■ Having held that the evidence is sufficient to show theft, we now address whether the evidence is sufficient to establish another essential element of capital murder, namely whether the appellant caused the death of the deceased with the intent to obtain or maintain control of the deceased's property. We note that there may be some question as to whether the appellant has raised this issue on appeal. Even though appellant may not have assigned such as error, or has not adequately briefed the question, we, nevertheless, address the issue in the interest of justice since it is dispositive of this appeal.

■ The Court of Criminal Appeals has held that where there is no evidence whatsoever in support of a key element of the offense the error is fundamental. *Gonzalez v. State*, 588 S.W.2d 574 (Tex.Cr.App.1979) (in particular footnote 1 at p. 575). Since such error constitutes fundamental error,

the specific ground does not have to be raised by the appellant.

In *Gonzalez*, the Court said:

"Upon appeal, appellant presents a single ground of error that contends that testimony from laboratory records and an exhibit purporting to report results of a laboratory analysis of a submitted substance were inadmissible. However, we find an unassigned error which should be reviewed in the interests of justice that is dispositive of the appeal and, accordingly, do not directly address the ground of error that is advanced."

■ A similar case with like holding is *Scott v. State*, 534 S.W.2d 711 (Tex.Cr.App. 1976). There, the Court stated:

"[a]ppellant's claim here (on appellant's motion for rehearing) is that the State presented *no evidence whatsoever* in support of its properly plead tolling allegations in the indictment. Accordingly, in our opinion upon original submission, we were in error in not considering this issue as unassigned error in the interest of justice." (emphasis supplied).

Where there is *no evidence* to support an essential element of the offense for which the accused was indicted and convicted, as is the case here, the Court must review the matter as unassigned error. A "no evidence" ground may be raised collaterally on a writ of habeas corpus. In *Ex Parte Coleman*, 599 S.W.2d 305, 307 (Tex.Cr.App. 1978), the Court said:

"Where there has been no evidence upon which to base a conviction, a violation of due process has occurred and the conviction may be attacked collaterally in a habeas corpus proceeding."

The due process requirement referred to above was articulated in *In Re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970). There the United States Supreme Court held, ". . . the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged."

■ In order to sustain a conviction for capital murder, the State must show that

the murder occurred *while the appellant was in the course* of committing or attempting to commit robbery. Art. 19.03(a)(2). Murder and a subsequent theft do not constitute capital murder unless the violent conduct causing death was done with the intent to obtain or maintain control over the victim's property. "In the course of committing or attempting to commit" is the phrase which requires the *mens rea* of the theft to accompany the violent conduct which causes death.

■■ The Court, in *Riles v. State*, 595 S.W.2d 858, 862 (Tex.Cr.App.1980) said:

"The phrase 'in the course of committing or attempting to commit . . .' as used in Sec. 19.03(a)(2), supra, is not defined in the Penal Code. Section 29.09(1) of the code, however, does define 'In the course of committing theft.' That phrase is given the definition of 'conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft.' We similarly construe the phrase of Sec. 19.-03(a)(2) to mean conduct occurring in an attempt to commit, during the commission, or in immediate flight after the attempt of commission of the offense, i.e., in this case, of robbery."

Section 29.02, in pertinent part, provides that a person commits the offense of robbery if, in the course of committing theft, and with the *intent to obtain and maintain control of the property*, he intentionally, knowingly, or recklessly causes bodily injury to another.

In order to sustain the conviction of capital murder in this case, in addition to proving beyond a reasonable doubt that the appellant caused the death of Amador Balderas Salinas by shooting him with a gun (which was established by direct evidence), the State was also required to prove beyond a reasonable doubt that the shooting occurred during the appellant's engagement in the conduct of obtaining and maintaining control over the deceased's watch, without his consent, and with the intent to withhold the watch permanently from the deceased.

In the instant case, there is no evidence to suggest that the deceased's murder occurred in the course of committing or attempting to commit a robbery. There is no evidence which supports a finding that the appellant shot and killed the deceased in immediate flight after the commission, or an attempt to commit, robbery.

The record shows that the three men lived in the same house. They appeared to be friends. They worked together. On September 24, 1978, the night before the killing, the appellant asked the deceased to go into town with him. There is no evidence that there had ever been any trouble, misunderstandings or differences between the appellant and the deceased.

The jury was asked to infer from the facts that the appellant killed his housemate in the course of a robbery when there are no facts from which it can be inferred that the appellant intended to forcibly deprive the accused of his watch before or at the time of the violent conduct. It is just as reasonable to infer that the appellant shot the deceased after having been cursed and threatened with a hammer, and only then, for reasons known only to him, did he decide to steal the victim's watch.

In the instant case, the only evidence adduced by the State from which it could be inferred that appellant shot the deceased with the intent to obtain or maintain control over the watch is appellant's recent unexplained possession of the watch. Ordinarily in a robbery case, the intent with which the violence was committed can be readily inferred from either the victim's testimony concerning the relationship between the theft and the violence, or from the testimony of an eye witness to the violence. But in this case the victim was not available to testify and there was not an eye witness to the occurrence. Without proof of other circumstances, the mere possession of the deceased's property some twenty-four hours after the killing is not enough to prove that the killing was done with the intent to obtain that property. The possession of the watch by appellant in this case, without more, is as consistent

with the fact that he killed to obtain it as with the fact that he did not. Where a person shoots his housemate, there are many plausible explanations other than that he killed with the intent to take the deceased's tangible personal property. Where the evidence gives rise to equal probabilities or possibilities, there is no evidence. *Texas Employers Ins. Ass'n v. Goad,* 622 S.W.2d 477, 480 (Tex.Ct.App.—Tyler 1981, no writ); *Calvert v. Union Producing Co.,* 402 S.W.2d 221, 227 (Tex.Civ.App.—Austin 1966, writ ref'd n.r.e.); *Weaver v. State,* 96 Tex.Cr.R. 506, 258 S.W. 171 (1924).

We must hold that there is no evidence to support a finding that the appellant was acting with the intent to obtain or maintain control over the watch when he shot and killed the deceased.

 The appellant also argues that the trial court erred in denying his motion for instructed verdict of not guilty because the evidence *conclusively* established that he acted in self defense. The only evidence tending to raise this issue was a portion of appellant's statement, offered by him, in which he claims that the deceased cursed him and swung at him with a hammer before the shooting. Because of appellant's interest in the matter on trial, these statements by the accused in a confession, even though uncontradicted, are not conclusive upon the State. Whether these claims were true was for determination by the jury. *Robinson v. State,* 119 Tex.Cr.R. 465, 42 S.W.2d 783 (1931); *Costillo v. State,* 98 Tex. Cr.R. 406, 266 S.W. 158 (1924). The jury in this case was instructed on the law of self defense. That issue was resolved against the appellant by the jury. Because self defense was not established as a matter of law, the trial court was correct in denying the appellant's motion.

The judgment of the trial court is reversed. No further prosecution of the appellant for capital murder shall be had, and an acquittal of capital murder is ordered to be entered in the light of the holdings in *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). It is, however, noted that the Supreme Court, in the cases of *Burks* and *Massey,* supra, did not reach the issue of whether the defendant could be retried for a lesser included offense, but held only that another trial for the same offense was barred by double jeopardy.

Following the rules announced in the opinion on motion for rehearing in *Moss v. State,* 574 S.W.2d 542 (Tex.Cr.App.1978), in the opinion in *Rogers v. State,* 575 S.W.2d 555 (Tex.Cr.App.1979), and in the opinion on motion for rehearing in *Ex Parte Harris,* 600 S.W.2d 791 (Tex.Cr.App.1980), we hold that the appellant may be indicted and tried for the lesser included offense of murder under the provisions of Tex.Penal Code Ann. § 19.02 (Vernon 1974).

The judgment of the trial court is REVERSED and the cause is REMANDED to the trial court for further proceedings.