**Robert King CONWAY, Jr., Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 09–86–183 CR.**

Court of Appeals of Texas,
Beaumont.

Nov. 4, 1987.

Rehearing Denied Dec. 8, 1987.

Jerry V. Pennington, Morris & Pennington, Orange, for appellant.

Stephen C. Howard, Co. Atty., Orange, for appellee.

## OPINION

BURGESS, Justice.

A jury found appellant guilty of capital murder, and punishment was assessed at life imprisonment in the Texas Department of Corrections by virtue of the jury's answers to the special issues. Appellant urges three points of error.

The first point of error challenges the sufficiency of the evidence. Appellant challenges the sufficiency of the evidence on both the issue of murder and whether the murder was committed while in the course of committing robbery. We approach both under the appropriate standard; *i.e.,* after reviewing the evidence in the light most favorable to the jury's verdict, whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Duhamel v. State,* 717 S.W.2d 80, 82 (Tex. Crim.App.1986).

Appellant was indicted for the murder of William Hoke while in the course of committing robbery. There were no eyewitnesses to the offense nor did appellant make any written or oral statement admitting the offense.

On December 22, 1985, William Hoke was the owner of Hoke's Exxon service station located on Interstate 10 in Orange, Texas. A long-time customer testified he

stopped by the station that evening between 10:15 and 10:45 p.m. He used the telephone in Hoke's private office, visited with the deceased and left. He noticed Hoke had a roll of money in his shirt pocket. An employee testified that he and a co-worker left the station around 10:55 p.m. and they left it in "perfect shape," meaning clean and tidy. The deceased followed the two employees to the front door and locked it behind them. The two then went to a convenience store, a tavern and finally returned to an all-night coffee shop located next to the service station. When they arrived at the coffee shop, they noticed that Hoke's truck was still at the station and a light was on. They left the coffee shop to check the station. Upon arriving, they found the front door unlocked and observed blood in the sales area. They noticed the door to Hoke's office was closed. Thinking this was unusual, they left and called the police.

A policeman arrived at approximately 1:00 a.m. on the 23rd. He entered the front door and observed blood on the floor and a trash can covered with blood just outside the door to the inner office. The door to the inner office was locked, but the officer could see through a glass in the door. He observed a body on the floor. The door was forced open and the policeman entered the office. The inner office was in disarray. The police found papers from the wallet of the deceased scattered around the office. They also found the wallet, glass fragments, a white button and a brown telephone receiver. The deceased was found with a brown telephone cord wrapped around his neck. Blood was splattered all around the floor and walls of the inner office. Not only was there blood splattered over the office, but a gold-colored radiator sealant substance was also splattered around the area. It was later discovered, at the autopsy, that a wire garrote with two strands of wire and nails for handles had been wrapped around Hoke's neck and embedded almost an inch. Hoke had been severely beaten about the left side of his face and head. There were two half-moon shaped wounds on the left side of his scalp. His left eyeball had been ruptured and his left ear severely lacerated. The facial bones were completely fractured. There were defensive wounds on his left hand.

The most damaging testimony came from a friend of appellant's, Allen LeFleur. He testified that he and appellant went to a movie the evening of December 22nd. Appellant then drove him home to an apartment near Vinton, Louisiana. He testified he arrived about 9:15 p.m. He went to bed and was awakened around midnight by appellant. He testified he opened the door and appellant was "covered with blood and real nervous." Appellant said he needed a place to take a shower. LeFleur took appellant to a vacant apartment where appellant showered and told LeFleur to "wash the blood off his boots and look in his shirt jacket." When LeFleur looked in the pocket, he found a roll of money partially covered with blood. Sometime during the exchange, appellant told LeFleur that "he couldn't believe what he had just done." He also stated that he had "hit a man in the head with a bottle and wrapped a telephone cord around his neck." He also told LeFleur that the victim of the assault "wasn't going nowheres." When LeFleur asked appellant how he was going to explain the blood, appellant replied that he was going to say that someone jumped him down at the sand pit. LeFleur testified that appellant offered him five hundred dollars ($500) to keep the money and keep quiet. Appellant then left LeFleur's apartment. When initially questioned by police, LeFleur denied any knowledge of appellant's whereabouts the morning of December 23rd. It was only after LeFleur received a promise of immunity from prosecution for giving a false statement, that LeFleur told his trial version of the events.

Appellant's girlfriend testified that appellant arrived at her home after midnight, reporting that he had been assaulted and robbed by an unknown assailant. The Louisiana authorities were called and investigated the incident. Appellant, his father, the girlfriend's father and the authorities went to the scene of the alleged assault. After arriving there, appellant found the

collar which had been ripped from his shirt and a lens from his glasses. The girlfriend's father said he was suspicious of this because he did not see any evidence of a fight or struggle where these items were found. LeFleur had previously testified that appellant himself ripped the collar off the shirt and ripped a pocket on his pants to fake the assault.

The officers who began the initial investigation went to appellant's home the day after the murder. Appellant became a suspect because he was a former employee of the station. They talked with appellant about his whereabouts and were given appellant's shirt. Appellant denied any involvement with the Hoke murder. Later, the state's forensic experts compared a button from appellant's shirt to one found on the floor of the service station and testified the buttons were identical. In January, appellant gave a statement to police acknowledging some knowledge of the Hoke murder. Appellant claimed that he had experienced a "flashback" and saw Hoke's body in this flashback.

Appellant's trial testimony was that he dropped LeFleur at LeFleur's apartment (around 9:30 p.m. according to other testimony). He then stopped briefly at the girlfriend's house and left there around 10:00 p.m. He proceeded to the sand pit area where he just stopped and thought. On his way home, he stopped by Hoke's station to visit and have coffee. On arriving at the station, appellant opened the outer door and observed a wad of money in the middle of the floor. He picked it up and proceeded into the inner office. There he discovered Hoke's body. He reached down and in the process of touching the body, got blood on his hands which he wiped on his jeans. He then became afraid and left. Appellant's version of the meeting with LeFleur is somewhat different than LeFleur's. Appellant admits going to LeFleur's and telling LeFleur that someone was dead. According to appellant, LeFleur then suggested that appellant take a shower. As he was taking the shower, he told LeFleur about the money and LeFleur began washing the money on his own volition. He left the money with LeFleur, but denied

offering LeFleur any money for his silence. Appellant then testified that he again went to the sand pit area where he was assaulted. He then went to the girlfriend's house to report the assault.

The state's evidence also consisted of a fingerprint expert testifying that he found appellant's thumbprint impressed into a layer of blood on the telephone receiver lying beside the body. This was the telephone receiver which had been connected to the telephone cord which was around the deceased's neck.

■ In summary, the evidence most favorable to the verdict shows:

1) Appellant was unaccounted for between 10:00 p.m. and 12:00 midnight. The likely time of the murder was between 11:00 p.m. and 12:00 midnight.

2) Hoke had been in a great struggle prior to his death. Appellant was uninjured at 10:00 p.m., but had an injury to his right hand by 12:00 midnight.

3) A button, similar if not identical to the button on appellant's shirt, was found in Hoke's inner office.

4) A telephone cord was wrapped around the neck of Hoke. The receiver which had earlier been connected to this cord was lying beside the body, covered with blood. Pressed into the layer of blood was appellant's thumbprint.

5) The recovered money was covered with human blood.

6) Just after midnight on the night of the crime, appellant was observed by a number of people to be covered with blood.

7) Hoke was found with a telephone cord around his neck and circular wounds on his head and hand just as appellant had told LeFleur.

8) Appellant admitted to taking the money from the Hoke station.

9) Appellant admitted to being inside the inner office of the Hoke station and touching Hoke's body.

10) The police found the light turned out and the door to the inner office locked. Appellant claimed to have turned this light

on when he saw the body of Hoke. Appellant offered no reasonable explanation why the light to the inner office was turned off or why the door to the inner office was closed and locked.

11) Appellant admitted to giving three different versions of his actions on the night of the crime.

The jury, of course, was entitled to believe all of Allen LeFleur's testimony and only that part of appellant's testimony which corroborated LeFleur's testimony. Although partially circumstantial, there is more than adequate evidence to find the elements of murder.

Murder and a subsequent theft do not constitute capital murder unless the violent conduct causing death was done with the intent to obtain or maintain control over the victim's property. *Cruz v. State*, 629 S.W.2d 852, 859 (Tex.App.—Corpus Christi 1982, pet. ref'd). The jury did not have to believe appellant's version of how he obtained the money. The intent to commit the robbery can be inferred from the recent possession of the stolen property. However, the mere possession of a victim's property is not necessarily consistent with the possibility that the murder was committed with the intent to commit robbery. Under this argument, the jury would have to believe that appellant committed murder and then took the money as an afterthought. This is not a reasonable hypothesis under the evidence. *See O'Pry v. State*, 642 S.W.2d 748, 760 (Tex.Crim.App.1982) (On Motion for Rehearing). If appellant had admitted the murder and advanced some motive for the murder other than robbery, then perhaps his point of error would have some merit. *See Cruz*, 629 S.W.2d at 860. He does not and it does not. The evidence is sufficient to sustain the verdict. Point of error number one is overruled.

■ Point of error number two complains of the trial court's failure to give the following requested issue:

The testimony of some witnesses must be considered with more caution than the testimony of other witnesses.

For example, a witness who has been promised that he or she will not be charged or prosecuted, may have a reason to make a false statement because he wants to avoid prosecution.

So, while a witness of that kind may be entirely truthful when testifying, you should consider that testimony with more caution than the testimony of other witnesses.

Appellant cites no Texas authorities for this instruction, but relies on *United States v. D'Antignac*, 628 F.2d 428 (5th Cir.1980), *cert. denied*, 450 U.S. 967, 101 S.Ct. 1485, 67 L.Ed.2d 617 (1981). *Reyes v. State*, 694 S.W.2d 556, 566 (Tex.App.—Corpus Christi 1985, pet. granted) held that the failure to submit a similarly worded instruction was not error in light of the fact that the jury was instructed they were the exclusive judges of the credibility of the witnesses and the weight to be given their testimony. Here, too, the jury was given a similar instruction.[1] The requested instruction was unnecessary. This point of error is overruled.

■ Appellant's final point of error alleges the trial court erred in admitting a photograph of the partial thumbprint found on the telephone receiver. Appellant's complaint is that the chain of custody was not established. The brown telephone receiver was submitted for fingerprint examination to the Texas Department of Public Safety Crime Lab in Austin. A member of the latent fingerprint section testified he received the telephone receiver and placed it in an evidence locker where it remained for several days. He then removed it for his examination. At some point, he determined he should have the print on the telephone photographed to enable him to better examine the print. He personally took the telephone to the photographic section of the laboratory and stayed with the exhibit while it was being photographed. Several days later he received the pro-

---

1. The jury was instructed: "You are the exclusive judges of the facts proven, the believability of the witnesses and the weight to be given their testimony."

cessed photograph of the thumbprint. It is this photograph of which appellant complains. He had previously testified, without objection, that the thumbprint on the telephone was the thumbprint of appellant. While the examiner was not given the "magic" question, "Did the photograph accurately reflect the thumbprint on the telephone?", he did testify, "This is the photograph of the print that was on the brown phone." This is sufficient authentication. A photograph, when properly authenticated, is competent evidence on any subject of which a witness's description is proper. Further, there is no error in admitting a photograph where there is testimony concerning the same thing. *Brown v. State,* 696 S.W.2d 913, 914 (Tex.Crim.App.1985). This point of error is overruled. The judgment is affirmed.

AFFIRMED.