**Steven Kent SCHORRE, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 13–91–333–CR.**

Court of Appeals of Texas,
Corpus Christi.

April 22, 1993.
Rehearing Overruled May 13, 1993.

Raymond H. Reese, Dietze & Reese, Cuero, for appellant.

Wiley L. Cheatham, Dist. Atty., Robert C. Lassmann, Asst. Dist. Atty., Cuero, for appellee.

Before NYE, C.J., and GILBERTO HINOJOSA and SEERDEN, JJ.

## OPINION

GILBERTO HINOJOSA, Justice.

A jury found appellant guilty of capital murder but failed to answer one of the special punishment issues, and the trial court sentenced him to life in prison. Appellant's sole complaint is that the evidence fails to support the conviction. We disagree and affirm.

The State was required to prove that, in the course of committing or attempting to commit robbery, appellant intentionally caused the death of Otto Fehner by shooting him with a shotgun. *See* Tex.Penal Code Ann. § 19.03(a)(2) (Vernon 1989). Specifically, appellant asserts the evidence is insufficient to show that he intended to obtain control of Fehner's property before or at the time he shot Fehner. Appellant asserts that the evidence merely shows a murder and a subsequent theft of Fehner's property. As appellant's sufficiency attack is limited, we will not summarize all of the evidence presented but will limit our dis-

cussion to the pertinent facts and then address appellant's particular arguments.

Appellant lived in a trailer adjacent to the house of his great-uncle, Otto Fehner, the eighty-three-year-old victim. On March 7, 1990, appellant had breakfast with Fehner at his house. After breakfast, appellant and Fehner argued. Shortly thereafter, between 8:00 and 9:00 a.m., Fehner called John Leick, his brother-in-law, and, while crying, told Leick that because of problems with appellant, he had told appellant to pack his clothes and get out. Fehner told Leick that appellant had wanted to use his car to go get a package of cigarettes. According to Leick, Fehner told appellant he could not use the car because if he wrecked it, he (Fehner) would be liable. Leick testified that during their conversation, Fehner did not say anything else about his problems with appellant. Fehner told Leick that appellant was packing his clothes and that his mother was coming to pick him up.

The next day, after being alerted that Fehner had not been seen, Leick went to Fehner's place with a deputy sheriff and discovered Fehner's body. Further investigation revealed that Fehner's car was missing, but his pickup truck was in the open shed. Fehner's wallet, which was not missing, contained about a hundred and fifty dollars.

Several days after the murder, appellant was arrested and confessed to killing Fehner. Appellant explained that after breakfast, he told Fehner that he was going to use his truck. Fehner told appellant he did not have the truck insured, but appellant said he was going to use the truck anyway. Fehner told appellant that he should pack and leave.

Appellant further explained in his statement that he and Fehner started talking about Aunt Minnie, Fehner's wife, who had died about two weeks earlier. Appellant told Fehner that the wrong person was in the cemetery and that if he had kept Minnie at home instead of putting her in a nursing home, she would still be alive. At that point, according to appellant, Fehner called him a "sorry, worthless, lazy son of

a bitch," and hit him lightly on the neck. Appellant then went to his trailer, thought about Aunt Minnie, and decided to kill Fehner. Around 9:00 a.m., appellant retrieved a shotgun and shot Fehner. Appellant said that he then contemplated suicide. The shell would not eject from the shotgun, so appellant became scared, and decided to run. He returned to his trailer, packed his clothes, and placed them in Fehner's car. He then forged a check and left in Fehner's car. He stopped in Cuero and charged a tank of gas to Fehner and cashed the forged check. Appellant then returned to Fehner's house, checked for mail, and returned to Cuero to pay Fehner's telephone bill. Appellant then drove to Texarkana. Appellant said in his statement, "My uncle Otto's striking me lightly had no bearing on me killing him. The main reason I killed him was because of his reactions towards the things said about my Aunt Minnie." Independent evidence was introduced to show that on the day of the murder appellant forged Fehner's name to a $179 check payable to himself. Appellant contends that this evidence only shows a murder followed by a theft of Fehner's property.

 The point at which appellant formulated his intent to take the victim's property is critical to differentiating, in the abstract, between the commission of capital murder and the commission of a murder followed by a theft. *See White v. State*, 779 S.W.2d 809, 815 (Tex.Crim.App.1989). A killing and unrelated taking of property do not constitute capital murder. *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex.Crim.App. 1986); *see Cruz v. State*, 629 S.W.2d 852, 858–60 (Tex.App.—Corpus Christi 1982, pet. ref'd). The State must prove that the murder occurred in order to facilitate the taking of the property. *Ibanez*, 749 S.W.2d at 807.

 Appellant attempts to show that his case is controlled by cases like *Ibanez* and *Cruz*. In *Ibanez*, the deceased and the defendant met, for the first time, in a gay

bar and returned to the deceased's apartment. Less than twelve hours later, the deceased's body was found. No property was missing except for the deceased's car. When the defendant was arrested, he confessed, and the State offered the confession in its case-in-chief. In the confession, the defendant stated that he became angry when the deceased violated an agreement concerning their method of sexual contact. He strangled the deceased, and then, in fear, grabbed the deceased's car keys and fled in his car. Applying the then-existing state voucher rule, the Court found that the State had failed to come forward with any evidence to discredit the defendant's version of the offense.[1]

In *Cruz*, we found insufficient evidence to support a capital murder conviction when the evidence showed only that the defendant killed a housemate and was later found in possession of the deceased's watch. We stated, "Where a person shoots his housemate, there are many plausible explanations other than that he killed with the intent to take the deceased's tangible personal property." *Cruz* was based on the premise that when a prior relationship is shown between the deceased and the defendant, the defendant's possession of one piece of the deceased's property, absent additional evidence, will not support a rational inference that the murder was committed with the intent to obtain that piece of the deceased's property.

 When considering the sufficiency of the evidence to support a guilty verdict, we review the evidence in the light most favorable to the verdict in order to determine whether any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt. *White*, 779 S.W.2d at 815. The ultimate question in this case is whether any rational trier of fact would be justified in finding from the evidence as a whole that appellant intended to take Fehner's property before, or as, he murdered him. *See White*, 779

---

1. The State is no longer bound by its own introduction of exculpatory statements. *Russeau v. State*, 785 S.W.2d 387, 390 (Tex.Crim.App.1990); *Guerra v. State*, 760 S.W.2d 681, 696 (Tex.App.— Corpus Christi 1988, pet. ref'd).

S.W.2d at 815; *Nelson v. State*, 848 S.W.2d 126, 128–32 (Tex.Crim.App.1992).

The thrust of appellant's argument is that the State failed to prove that he had intended to take any of Fehner's property before he killed him. Appellant contends the evidence is insufficient because, in his view, Fehner's argument with appellant centered on the use of Fehner's pickup, which was left behind at the house, and not the car, which he took. He further argues that the evidence does not establish his intent to take Fehner's property because he contemplated suicide after killing Fehner and because his mother was coming to pick him up. Next, he argues that the lapse of time between the killing and the taking of the car, a lapse which appellant claims may have been as much as three hours, was not consistent with an intent to steal. Finally, appellant asserts that his action after the killing, such as paying Fehner's telephone bill, was not consistent with the intent of a person committing robbery. We will address these contentions in the order raised by appellant.

Appellant first argues that his argument with Fehner was not over use of Fehner's car but over use of the pickup truck. We disagree. Although appellant's statements refer to use of the pickup truck, Fehner's telephone conversation with John Leick related information about use of the car. Appellant notes that Leick admitted on cross-examination that Fehner's use of the term "car" could have meant "pickup" and argues that, as appellant's statement referred to the pickup, the argument concerned the pickup. While the evidence could be viewed in this manner, our duty as an appellate court is to view the evidence most favorably to the verdict. In doing so, we find that the evidence shows that the argument concerned Fehner's car. If, however, the argument had been over the use of Fehner's truck, any reasonable juror could view this as evidence that appellant intended to use one of Fehner's vehicles. With regard to appellant's intent, the particular vehicle is not material, and so this portion of appellant's attack on the sufficiency of the evidence misses the point. The significant fact is that the evidence shows that appellant professed his intent to use one of Fehner's vehicles, without Fehner's consent, during their argument *before* the murder.

Appellant further claims that, as he contemplated suicide, the evidence shows that he did not have a pre-existing intent to steal. We disagree. First, the jury was free to disbelieve appellant's claim that he contemplated suicide after the killing. *See Bonham v. State*, 680 S.W.2d 815, 819 (Tex.Crim.App.1984) (jury free to disregard exculpatory claims). Second, even if appellant contemplated suicide, he could have developed that thought as a result of killing Fehner, regardless of any intent or motive which he possessed before or as he killed Fehner.

Next appellant contends that because the evidence shows his mother was coming over to Fehner's to pick him up, he had no need to steal Fehner's car, and therefore formed no intent to steal. We disagree with appellant's suggestion that this fact evidences a lack of intent to steal. Even if it does, this fact must be viewed in light of the other circumstances.

Finally, appellant contends that his actions after the killing demonstrate a lack of intent to steal. We disagree. We believe the evidence supports the verdict. A rational trier of fact could have decided that appellant's post-killing conduct (in forging a check payable to himself and his attempts to conceal the offense by collecting Fehner's mail and paying the telephone bill) exhibit signs of calculation, thereby rebutting appellant's claim of having suddenly become scared and deciding to run. If the jury determined that appellant's conduct after the killing was calculated to help conceal the offense, they may well have decided that appellant planned his flight, complete with stealing the car and forging a check, before he carried out the killing. Accordingly, we do not find that appellant's contentions are meritorious.

In summary, the evidence shows that appellant and Fehner argued over the use of Fehner's car before the killing. When Fehner denied him permission to use the

725

vehicle, appellant said he was going to use it anyway. Appellant then went to his trailer but returned to Fehner's house, killed Fehner, took his car, and forged a check. This evidence established that appellant wanted to use Fehner's car before the killing and demonstrates appellant's intention to take Fehner's car despite Fehner's refusal.

We find the evidence sufficient to sustain the conviction. The judgment of the trial court is affirmed.

