Jermiah B. O'PRY, Appellant,

v.

The STATE of Texas, Appellee.

No. 66144.

Court of Criminal Appeals of Texas,
En Banc.

May 20, 1981.
On Rehearing Dec. 22, 1982.

Reed Jackson, Fairfield, for appellant.

Robert W. Gage, County Atty., Fairfield, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

OPINION

DALLY, Judge.

This is an appeal from a conviction for capital murder. The punishment is death.

The appellant contends that certain prospective jurors were improperly excused in light of the recent United States Supreme Court holding in *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). We agree and reverse.

In *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), the United States Supreme Court said:

"Specifically, we hold that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction."

Included in the statutory scheme in the New Penal Code of 1974 for imposition of the death penalty in Texas is the requirement that each juror take an oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact. V.T.C.A. Penal Code, Sec. 12.31(b). The holding in *Witherspoon* was repeatedly found to be "alive and well" in light of this scheme. See, e.g., *Brock v. State,* 556 S.W.2d 309 (Tex.Cr.App. 1977), cert. denied 434 U.S. 1002, 98 S.Ct. 647, 54 L.Ed.2d 498 (1977). Prior to *Adams v. Texas,* supra, this Court consistently held that under this statutory scheme a juror could be excluded under Sec. 12.31(b), supra, independent of a determination that his exclusion was consistent with *Witherspoon.* See, e.g., *Moore v. State,* 542 S.W.2d 664 (Tex.Cr.App.1976), cert. denied 431 U.S. 949, 98 S.Ct. 2666, 53 L.Ed.2d 266 (1977); *Hovila v. State,* 532 S.W.2d 293 (Tex.Cr. App.1975); *Bodde v. State,* 568 S.W.2d 344 (Tex.Cr.App.1978), cert. denied 440 U.S. 968, 99 S.Ct. 1520, 59 L.Ed.2d 784 (1979).

However, in *Adams v. Texas,* supra, the Supreme Court held that under the United States Constitution the State may not exclude a prospective juror under Sec. 12.-31(b), supra, on grounds which exceed the limitations set out in *Witherspoon:*

"The State could, consistently with *Witherspoon,* use Sec. 12.31(b) to exclude prospective jurors whose views on capital punishment are such as to make them unable to follow the law or obey their oaths. But the use of Sec. 12.31(b) to exclude jurors on broader grounds based on their opinions concerning the death penalty is impermissible."

448 U.S. at 48, 100 S.Ct. at 2528, 65 L.Ed.2d at 592. The Supreme Court concluded that the jurors in *Adams* had been excused under Sec. 12.31(b), supra, in violation of the Sixth and Fourteenth Amendments to the United States Constitution, stating:

"[N]either nervousness, emotional involvement, nor inability to deny or confirm any effect whatsoever is equivalent to an unwillingness or an inability on the part of the jurors to follow the court's instructions and obey their oaths, regardless of their feelings about the death penalty . . . .

\* \* \* \* \* \*

"[I]n the present case Texas has applied Sec. 12.31(b) to exclude jurors whose only fault was to take their responsibilities with special seriousness or to acknowledge honestly that they might or might not be affected. It does not appear from the record before us that these individuals were so irrevocably opposed to capital punishment as to frustrate the efforts to administer its constitutionally valid death penalty scheme."

448 U.S. at 50, 100 S.Ct. 2529, 65 L.Ed.2d at 593.

The same error which the United States Supreme Court found in *Adams* also appears in this case. The State moved to exclude venireman Earnest Aldridge because he could not state that his deliberations would remain unaffected by the mandatory penalty of death or imprisonment for life. The relevant portions of his voir dire examination are set out below.

"Q. [PROSECUTOR]: Is there anything about being an ordained minister in

"the Assembly of God Church that would give you particular difficulty in sitting on a Jury where the death penalty might possibly be assessed?

"A. Not to my knowledge, Mr. Gage. It is not the most comfortable position, but I am not aware of any tenets of faith or organizational structure that would hinder a person to be in that position.

"Q. Then in the proper facts and circumstances, you are in favor of the death penalty? Is that what you're telling me?

"A. Under the circumstances, yes.

\*　\*　\*　\*　\*　\*

"A. ... I have some very firm convictions that the death penalty is appropriate and would be very—would be acceptable and then whenever I come to me, frankly, as you placed it, you make me say yes or no; I guess I'm going to say, I probably— some of my background would probably come out, Mr. Gage, and I probably would have reservations. Now, I'm not opposed to the death penalty, personally.

\*　\*　\*　\*　\*　\*

"Q. [DEFENSE COUNSEL]: Now, what we need to know in that regard since you're not opposed to the death penalty in the proper circumstances, would you automatically and let's underline automatically, return a verdict to prevent the imposition of the death penalty?

"A. There were a lot of beautiful scriptures and cliches that I had in my mind—whether I would automatically do it just because of my background efforts and again, I have never been placed in that position so—I still maintain the position that I am in favor of capital punishment. For me to be able to say definitely that I would vote against it—I guess I'm wavering again, aren't I?

\*　\*　\*　\*　\*　\*

"A. I do have reservations.

"Q. Okay. With that in mind, reservations is not saying that you would automatically return a verdict that would prevent the imposition of the death penalty.

"A. That's true.

"Q. So in effect, you are saying that you would not automatically vote against the death penalty?

"A. That's correct, likewise."

On further questioning, the venireman indicated that he felt the mandatory punishment of death or life imprisonment would affect his deliberations. The State's challenge for cause on this basis was sustained over appellant's objection that the venireman was not disqualified under *Witherspoon.*

As in *Adams,* the prospective juror in this case was excluded under Sec. 12.31(b), supra, although his voir dire responses do not indicate that he was irrevocably opposed to capital punishment; this exclusion was therefore improper. As the State concedes, an examination of the record reveals that veniremen James Smith, Wayne Cannon, and Zella Bunch were also improperly excused for cause under Sec. 12.31(b), over appellant's objection, on broader grounds than those permissible under *Witherspoon.* The death penalty may not be imposed if even one prospective juror has been excluded in violation of *Witherspoon. Davis v. Georgia,* 429 U.S. 122, 97 S.Ct. 399, 50 L.Ed.2d 339 (1976).

The State in this case recognizes that the judgment imposing the death penalty cannot be affirmed in view of the Supreme Court's opinion in *Adams v. Texas,* supra, and moved the Court in oral argument to affirm the judgment of guilt but to reform the judgment to provide for the only other possible punishment, that is imprisonment for life. The author of this opinion, Judge Roberts, and Judge McCormick would grant the State's motion. However, a majority of the Court would not. See *Pierson v. State,* 614 S.W.2d 102 (Tex.Cr.App.1980) (On Motion for Rehearing, overruled without written opinion on 4/29/81, McCormick, J. dis-

sent, joined by Dally, J. joined in part by Roberts, J.); *Evans v. State,* 614 S.W.2d 414 (Tex.Cr.App.1980) (Roberts, J. dissent) (On Motion for Rehearing, overruled without written opinion on 4/29/81, McCormick, J. concurrence joined by Dally, J.); *Loudres v. State,* 614 S.W.2d 407 (Tex.Cr.App.1980) (Roberts, J. dissent) (On Motion for Rehearing overruled without written opinion on 4/29/81, McCormick, J. dissent joined by Dally, J.); *Grijalva v. State,* 614 S.W.2d 420 (Tex.Cr.App.1980) (Roberts, J. dissent) (On Motion for Rehearing, overruled without written opinion on 4/29/81, Dally, J. dissent).

Accordingly, in light of Adams v. Texas, supra, the judgment is reversed. The decision does not prevent the State from again seeking the death penalty on retrial.

The judgment is reversed and the cause remanded.

Before the Court en banc.

### OPINION ON STATE'S AND APPELLANT'S MOTIONS FOR REHEARING

ROBERTS, Judge.

Appellant was indicted for capital murder. The evidence was circumstantial, but the verdict was guilty and the punishment, death.

On original submission, we reversed the conviction because several prospective jurors were excluded in violation of *Adams v. Texas,* 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). Declining the State's motion that the court reform the judgment to provide a punishment of life imprisonment, we remanded the cause.

Subsequently, however, on June 1, 1981, the Governor commuted appellant's sentence from death to life imprisonment. In a timely motion for rehearing, the State requested that we again consider reformation of the judgment in light of the Governor's action. Appellant also filed a motion for rehearing, arguing that our original opinion was not "mooted" by the Governor's commutation, which he did not seek, and to which he was opposed. In the alternative,

appellant asked that we review his remaining grounds of error, particularly the sufficiency of the evidence.

■ We observe first that our decisions in *Turner v. State,* 485 S.W.2d 282 (Tex.Cr.App.1972), and *Harris v. State,* 485 S.W.2d 284 (Tex.Cr.App.1972), dispose of appellant's claim that we are without authority to reform the judgment. In each of those cases, we originally affirmed the trial court's judgment, only to see the United States Supreme Court reverse insofar as the death penalty was concerned because of violations of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). On remand from the Supreme Court, we reversed the trial court's judgment in each case, and remanded for a new trial. After then-Governor Preston Smith commuted the death penalty in each case to life imprisonment, however, we granted the State's motions for rehearing, set aside the orders of reversal, and affirmed the judgments of the trial courts, as reformed.

As the State points out, the only difference between *Harris* and *Turner* and this case is that appellant did not have to go to the United States Supreme Court to secure a reversal. Our opinion on original submission here accomplished exactly what our opinions on remand in *Harris* and *Turner* did, and we see no reason why the Governor's commutation should not be given effect. As we said in *Adams v. State,* 624 S.W.2d 568, 569 (Tex.Cr.App.1981), "[o]nly upon entry of a new judgment of this Court and the issuance of this Court's mandate upon that judgment would the trial court's judgment, and with it the jury's death-producing verdict, be set aside." No mandate having been issued here, we are free to grant the State's motion for rehearing.

Notwithstanding this, however, we must consider appellant's remaining grounds of error, lest his right to a full review of his contentions go unhonored. *See* Articles 44.-02, 44.24(d), V.A.C.C.P. We begin with his arguments that the evidence is insufficient to show that he intentionally caused the death of the victim, Durbin Ward, or that

he killed him in the course of committing a robbery, as alleged in the indictment. If appellant is correct, of course, *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978), mandate that we reverse and enter a judgment of acquittal.

The evidence the jury heard was as follows:

Wilma Day Ward, the widow of the deceased, testified that they had a farm on Highway 84 about eight miles east of Fairfield toward Palestine. The deceased had lived there from 1904 until August of 1977, when they moved to Fairfield because he had had a heart attack and "couldn't do what he had to do" on the farm. About 8:00 a.m., on January 21, 1978, the deceased went to buy cattle feed and cat food, and to the farm to feed his cows. There was snow on the ground. The deceased carried a billfold in his shirt pocket because it had his driver's license, but he had no folding money. He only had a little change in his pocket. He carried a pocket knife, which was State's Exhibit One. He did not own a rifle, and it has been several years since he had been hunting. If a .22 cartridge was found in his car, it was not his. The deceased drove a Ford automobile; photographs of it were identified. When the deceased failed to return home by noon, Mrs. Ward called her brother to go out to the farm to see if the deceased was bogged down.

Claude Anderson ran a grocery store in Fairfield. Between 9:00 and 9:30 a.m., on January 21, 1978, the deceased came in the store, talked awhile, and bought a can of cat food. He paid twenty-three cents for it, telling Anderson that was all he had. Around 3:15 p.m., Anderson went with Lucky Newton to the deceased's farm to look for the deceased. It was seven or eight miles to the farm; they arrived around 3:30 p.m. The gate was not locked, but the witness could not say whether this was normal. They did not see the deceased's car, but his dog was barking on the porch. They opened the door and found the deceased's body sitting in a chair in front of the fireplace, right inside the door. Newton went to his truck and telephoned the sheriff. There were some feed sacks lying between the house and the barn, but a couple of inches of snow had "just covered up all evidence of anything." The witness did not see any tracks at the gate, or any footprints anywhere. Anderson and Newton kept looking for the car but they did not find it. They did not go into the barn or feed area. Anderson saw no blood on the steps or the porch, which the snow had covered. He saw no signs of a struggle.

Lucky Newton was called by his grandmother to look for the deceased. He and Anderson left the store and got to the farm about 3:20 p.m. It was snowing hard. He drove up in the yard and toward the barn, but the barking dog caused them to go to the house. He opened a screen door and a wooden door and saw the deceased sitting in a chair with his hat and glasses on. Newton did not enter the house as Anderson did, but went to his truck and called the sheriff. Then he and Anderson drove around the barn and over in the field looking for the old car. Because of the snow, they didn't even find tire tracks; it snowed all day. Tracks would have been snowed out in thirty minutes. There were three or four inches of snow. He saw no evidence of violence and no blood outside the house.

Charles Nicholson was a deputy sheriff who was in charge of the investigation. He went to the farm after Lucky Newton's call. Newton and Anderson directed him inside the front door where the body was located. He sealed off the area. He photographed the body before it was touched, and he photographed the body after removing the hat. He searched the house, but he found no evidence, no cartridges, no signs of a struggle. He found blood in the immediate vicinity of the body; it was directly below the window, to the right of the window, "on the back of the chair right back of his head," and two spots on the table. No blood was on the floor except just below the window; none was anywhere in back of the chair. Because there was snow on the

ground, he could not determine if there was any blood on the ground. Before a lunch break, Nicholson testified that there was no snow on the porch and there was no blood. After lunch, Nicholson testified that there was no snow on the porch at first, but it started snowing heavily after a very short time; the porch was covered with snow by the time he left (except for an area directly in front of the door where there had been heavy traffic) and he gave up. He had an opportunity to look at the porch before it was covered with snow, and he found no blood. He looked again after the snow melted and found no blood. He found no blood in the barn. He did find an impression in the hay in the barn, "where it appeared that someone had possibly laid or laid in the hay that was for some period of time." This indentation, in the form of a body, was about two inches deep. He photographed the indentation but the pictures "did not come out. Could not distinguish anything from them." A person sitting or lying in that place could have a good view of the road approaching the barn and house. He also found some torn feed sacks in the yard; cattle were eating from them; he could not determine how they were torn open.

Nicholson felt in the deceased's back pocket for a wallet, but he found none. At the funeral home he found a .22 caliber slug inside the left coat sleeve. He also found "two partial teeth" on the front of the deceased's overalls, held there by congealed blood.

Nicholson went to Bell County after receiving word on January 22 that the deceased's car and two suspects had been seized. He searched the car and found nothing. Then he took the two suspects and their property from Leroy Peters. The suspects were the appellant and Zane Schoonover. He had them "arraigned" before the municipal judge in Temple. The property he received was in two packages; in the package marked "Jermiah O'Pry" he found the knife now marked as State's Exhibit One and the appellant's wallet, which contained State's Exhibit Seventeen, a pawn ticket from D & B Pawn Shop in

Euless, for two rifles. Nicholson went to Euless and got the .22 rifle from the Euless Police Department. (He did not ask for or receive the .30–30 rifle, but appellant later introduced it into evidence.) The property he received did not include the appellant's outdoor jacket.

The appellant asked Nicholson to check on his car, gave him the key, and told him where it was. Nicholson could not find it at first, but the next day, after getting more exact directions, he found it. It was behind some trees in Wildwood Addition, east of Fairfield. This was about six miles from the deceased's farm, between the farm and Fairfield. The car, a 1967 Dodge, was registered in the appellant's name (no objection to this hearsay). It was in running condition but it was in some mud and Nicholson did not try to get it out.

Schoonover was released from custody because "investigation revealed he was not in this area" on January 21. He passed a polygraph test, and the appellant agreed that he picked up Schoonover as a hitchhiker on I–35. (No objection to any of this.)

Van Day, the deceased's brother-in-law, went to the deceased's farm about 12:30 or 1:00 p.m., on January 21, after his sister (the deceased's wife) called him. When he got to the gate he saw tracks in the mud, one set from the west and one set from the east. He concluded that the deceased had come in from the west (Fairfield) and gone out turning east. He went down to the house and saw the dog on the porch. He did not go in. He saw no car. It looked like one set of tracks going in and one set going out. The last car went east. There was no snow in the "car ruts." He "couldn't tell you" about how old the car tracks were. He saw the feed sacks broken open, as though "he just pitched the feed out." The cows had "practically eaten it up."

William Starnes was a DPS communications operator. On January 21, he broadcast descriptions of the deceased's car and a suspect. At midnight, he got off work (in Waco apparently, although this was not

stated expressly) and was driving south on I-35 to Temple when he overtook the deceased's car at "Bruce Mill Eddy (phon.)." (This must have been the court reporter's version of Bruceville-Eddy, which the map shows to be two towns on I-35 south of Waco.) He radioed for assistance. Two DPS "units" and a Bell County Sheriff's "unit" arrived. The officers stopped the car and arrested the two occupants. The "suspect vehicle" did not "make any attempt to run."

Hollis Riggins was a DPS trooper. He participated in stopping the deceased's car on January 22, and he arrested the driver, who was the appellant. This was accomplished by shining very bright spotlights into the car until it stopped and then ordering the occupants out at gunpoint. The appellant was "fairly dirty"; his bushy, red hair was greasy and unkempt; he had a bushy beard "on his chin portion"; he was wearing wire-rimmed glasses; he was wearing a "parka type" or "military fatigue type" coat and "numerous pairs of clothing, apparently for insulation." Riggins searched the appellant for weapons and seized a package of cigarettes, a wallet, and a pocket knife which "looks like" State's Exhibit One. He gave the knife and billfold to Lt. Jackie Howell of the Bell County Sheriff's Office when they left for the county jail; they were the only knife and billfold given to Howell that night. The appellant reacted to the arrest with no emotion, which was unusual. He did not ask Riggins why he was being arrested. (No objection to this.) He made no effort to struggle or flee, and he did "what he was advised to do."

Kirby Denby was a DPS trooper who was Riggins' partner. His part of the arrest included searching the car. He found an old, maroon wallet in the glove box; the only thing in it was an old safe-driving award in the deceased's name. On the back floorboard he found a .22 long rifle bullet, which he gave to Trooper Nesby. The only other things found in the interior were a backpack and some trash. In the trunk were a spare tire, a jack or wrench, and "a bunch of hay." The appellant's attitude

was "rather indifferent"; he did not appear surprised or scared, and he did not speak. (No objection to this.) The appellant made no effort to elude the officers when the red lights came on. He was wearing a "heavy insulated style coat."

Richard Nesby was a DPS highway patrolman who participated in the arrest. The appellant stopped normally; he did not try to run or anything. He was behind the steering wheel of the deceased's car. He had a long beard and long, unkempt hair. He was wearing Levi's and a "real heavy," waist-length, dark green or blue coat. The appellant did not show any emotion, which was unusual, but Nesby had never participated in an arrest of a murder suspect by five men with guns drawn. Nesby searched the car and performed an inventory. He saw another trooper find a "fairly new" .22 long rifle cartridge on the left rear floorboard. Nesby put the bullet and the wallet they had found in the glove compartment, in his coat pocket. When he got to the sheriff's office forty minutes later, the bullet was gone. He thought he dropped it when he removed the wallet to show Riggins the "I.D. card of the deceased."

Jackie Howell was a lieutenant in the Bell County Sheriff's Department. He and Lieutenant Moore participated in the arrest. He searched the passenger, Schoonover, a short, stocky, man in his early twenties, with short dark hair and no beard, wearing beige pants, a light-colored shirt, and a heavy coat. (On cross-examination, Howell admitted that Schoonover's photograph showed long hair and a full beard.) The appellant was unusually calm and did not seem to be concerned or frightened. No property was taken from Schoonover. Howell received a wallet, a pocket knife, and a package of cigarettes, which Riggins had taken from the appellant. He gave the knife and the billfold to the evidence officer, Leroy Peters. He took the suspects to the county jail, booked them, turned in the property, and conducted strip searches. The appellant was wearing a bulky, heavy, dark blue, waist-length, military flight jacket, and several shirts and several pants.

Howell did not know what happened to the jacket. The appellant had a reddish beard and long hair, and he had "straw—or what appeared to me to be hay" in his hair and beard. After the appellant took off his first layer of clothes, with every other layer there seemed to be hay falling from his clothes, at least a handful, and stronger body odor. Schoonover had no hay in his clothes or hair.

Leroy Peters was a jailer at the Bell County jail. Howell gave him a wallet and a knife which he "booked in" as the appellant's and put in the appellant's property bag. Also booked in as the appellant's were $25 in currency, $0.27 in change, a wristwatch, keys, a belt, a pair of work gloves, and a blanket with clothes rolled in it. He gave the property to Deputy Nicholson of Freestone County.

Lorraine Cox worked part-time with her husband, Alfred Cox, at D & B Pawn Shop in Euless. She identified State's Exhibit Seventeen as the customer's copy of a pawn ticket which she made out on January 21. The customer drove up in "an older . . . kind of junky looking car" between 3:00 and 4:00 o'clock. He was alone. He got out of the driver's side and laid in the back seat for five, ten, or fifteen minutes. Then he came in with two rifles and pawned them for $40. He showed his driver's license as identification. She took down his license number, date of birth, sex, and race. (It was not stated that she took his name also, but the witness called the customer "this person Jermiah O'Pry," and the exhibit bears the name, "O'Pry, Jermiah.") He gave the address 183 Motel No. 6, Euless. He had red hair which was not combed and neat, "he looked like he needed a shave . . . and could have stood a bath all over," and he was "smelly." He was not wearing a knee-length coat, but he may have been wearing a jacket. The witness "couldn't swear [the appellant] was the same man," but he "fits the same general description." She agreed that if the appellant was the customer, he looked a lot different at trial. She agreed that she was satisfied from the driver's license that the man who pawned the guns was, in fact, Jermiah B. O'Pry.

She identified State's Exhibit Seventeen-A as the Mossberg that O'Pry pawned and Defendant's Exhibit Two as the .30–30 which he had pawned at the same time.

Albert Cox operated D & B Pawn Shop. Although the appellant looked "a good bit different than he did the time I saw him before," Cox was sure that the appellant was the man who pawned two rifles in his shop on January 21. Cox identified the rifles, State's Exhibit Seventeen-A (the Mossberg) and Defendant's Exhibit Two. The appellant drove up in an older car, alone. He lay down in the back seat a good while, something like five or ten minutes. Cox could see movement over the front seat, and his opinion was that the appellant was trying to get the rifles from under the front seat.

D.F. Pittman did not appear, but the parties stipulated that he would testify that he owned the 183 Motel in Euless; that Jermiah O'Pry was a resident there from February 8, 1977, through June 7, 1977, but not after that time and specifically not on January 21, 1978; and that O'Pry paid his bills on time and did not destroy any property.

Michael Harris was a Euless police officer. He identified State's Exhibit Seventeen [sic; actually, Seventeen was a pawn ticket, while Seventeen-A was a rifle] as a .22 Mossberg which he "seized" at D & B Pawn Shop on January 23. "[W]e tore the gun down trying to find the serial number," but they could not. Then he put it in the property room, and he "believed" it was released to Deputy Nicholson.

David Barnes married the deceased's great-niece. He saw the deceased around once a week, at least. He identified State's Exhibit One as the deceased's knife which the deceased "carried with him all the time . . . in one of his pockets," although he couldn't say which one. Every time Barnes ever saw the deceased, he had the knife. He admitted that Ward might have left the knife in his car on the day of his death, but said, "I don't think he would."

L.R. Whatley was a justice of the peace. He gave warnings to the appellant and set his bond. He identified a "warning of rights" form which showed that this was done at 9:30 a.m., on January 22, 1978. The appellant signed the form, indicating that he understood his rights.

Robert Walter was a pathologist. He performed an autopsy on the deceased's body at Capps Funeral Home on January 21. Because the body had already been embalmed, Dr. Walter could not determine the approximate time of death. There were two gunshot wounds, one in the left arm, and the other "right up close to the neck." The first bullet fractured Ward's arm, and the second knocked out some of Ward's teeth as it exited "through the mouth in the right aspect." The latter wound, according to Dr. Walter, was the fatal one; it had "bled profusely" and Ward had essentially "drowned in his own blood."

The bullet that entered the arm produced a "front entry wound." The other bullet went into the back of Ward's neck and travelled "downward and medially" toward the spine before exiting. "It was a small caliber bullet," Dr. Walter thought, "not as large as a .38" but "something like a .22 or .25, in that ball park." Dr. Walter believed that Ward must have been shot "either in the chair or in a very close proximity to the chair; either standing up or kneeling somewhere very close." Otherwise, Dr. Walter said, "he would have had to have left a blood trail" to get to the chair. "He could not have been somewhere else in the room or outside the building because there would have been a blood trail."

Dr. Walter also thought that Ward was either sitting or kneeling when he was shot in the neck; either that, or else a "very tall person" or "somebody standing on something" shot him because the bullet passed downward. But Dr. Walter had "no idea" where Ward was at the time he was shot in the arm.

Based on the photograph taken of Ward's body, and of the room, Dr. Walter agreed that the fatal wound could have been inflicted by someone standing in the doorway leading from the bedroom to the living room. In any event, Ward's face was turned away from the assailant at the time he was shot in the neck. It took him between two and six minutes to die; he would have been unconscious prior to his death.

In addition to the bullet wounds, there was a "large superficial laceration" on Ward's head, a "large contusion on the left eyebrow," a laceration on the lip, and "ecchymosis" on the right ear. The injury to the ear could have been caused by a blow or by a fall, but "probably not" by the bullet in the neck. The head laceration also could have resulted from a fall rather than a blow, but only if Ward's head "struck something that was above the level of the ground." The contusion above the eyebrow "was probably caused by a blow," not a fall; the laceration of the lip "was produced by the teeth as they were knocked out of the patient's mouth by the bullet."

Dr. Walter testified further that when Ward was shot in the neck, bleeding would have commenced at once. However, he probably would not have become unconscious immediately, and the wound would have been "survivable" if "the head were down so the blood would flow out of the mouth instead of into the lungs" (and if "somebody stopped the bleeding"). Dr. Walter conceded that Ward might have been shot in the barn and dragged feet first into the house without a great deal of blood loss, but said this possibility was "relatively remote." Upon objection, defense counsel withdrew his "speculation" that Ward was shot "in a moment of compassion."

Ward was, "in practically all probability," still alive at the time whoever shot him left, if the person left immediately after shooting him. The doctor agreed that using a .30–30 would be "more productive" than using a .22 if a person had "the vicious, cruel intent to murder someone," but said on redirect that a .22 was the gun more frequently used to kill people ("there are more of them").

The death was no accident. Dr. Walter did not know if it was a "particularly brutal murder" compared with others he had seen;

he found it "hard to think in terms of relative brutality."

Jenis Scroggins was a firearms examiner. She tested the bullet found in the sleeve of Ward's coat to see if it had been fired from the .22 rifle. The bullet was a .22 caliber bullet; in her opinion, it was "long rifle" ammunition. She believed it was "possible" the bullet could have been fired from the .22. It was "certainly possible" it might not have been. It was hard to run ballistics test on .22 bullets; even under the best conditions, identification occurred only in 20% of the cases. The .22 bullet here was damaged. She could not say it had been fired from appellant's rifle.

W.R. Knight was an investigator for the Freestone County Attorney. O'Pry had been working for a carnival in Fort Worth until September of 1977. In January of 1978, he was living at the Fairfield Motel on Highway 84. He checked out on January 18th. Knight had taken a written statement from O'Pry on the afternoon of January 23rd. He read him the same rights Judge Whatley had read him. The statement was introduced as State's Exhibit Number 21.

With the warnings omitted, the statement read:

"My name is Jermiah B. O'Pry and I am twenty-five years of age; I was born in Houston, Texas, and at present I consider the following address my home, General Delivery, Fairfield, Texas. Hitchhiking a little ways past Corsicana where I was picked up by a guy in a Pontiac. He was about 50 or 60 years old. He took me to Dallas. I went to the bus station. I bought the car from a guy for a hundred dollars. I was going to buy a ticket to El Paso, but bought the car. I went to Euless, Texas, decided to go by bus; left the car at Buddy's store and went to the bus station. The station was closed at four. I got there about 4:20 or 4:30. The only person I know that might remember me was the guy from the barber shop next to the bus station. I went back to Buddy's, called the Fort Worth bus station about a ticket. It would have cost $36.10 to El Paso. I waited around until a little after six. The guy from the barber shop came back. Then I was standing out in front with my things. Decided to take the car. Picked up a hitchhiker on I-35. We stopped at a coffee shop on 35 outside Waco. Left there and was picked up by the Highway Patrol. The car we were picked up in was a four door black Ford; about a '63."

Knight had questioned O'Pry about "every place" he had been on January 21st. O'Pry said nothing about the Euless pawn shop. Knight tried twice to contact the "guy from the barber shop," whom he presumed was a barber. He thought that a barber, "being a person that deals with the public," might have remembered O'Pry. He did not contact anyone at the bus station.

Knight had also talked to Mrs. Edna Rutherford, who had seen someone in Ward's car on January 21st. On February 16, he showed her a photographic identification spread with six photographs. The spread included pictures of O'Pry and Zane Schoonover. Only three of the six persons had glasses. Only one was a bearded person with glasses—the defendant, O'Pry. He was the person Mrs. Rutherford picked out. Knight had not told her they suspected O'Pry; she had chosen his photo on her own.

Edna Rutherford testified next. She and her husband lived on property that bordered Ward's land. She had known Ward for two years, and knew what his car looked like (It had a bumper sticker that read, "Pass with care—driver chewing tobacco"). She identified the three photos of Ward's car shown to her. On January 21, she and her husband and their son were going east on Highway 84 toward Palestine at about 11:15 a.m. She saw Mr. Ward's car, which was also going east. She knew it was "pretty close" to 11:15 because she had looked at her watch. Ward was not driving the car. She and her husband were curious because they had never seen anyone but Ward driving the car. The car was going "a little slower" than their car, and so they

came up behind it. She saw only one person in the car, the driver. He had "long dirty looking hair."

After waiting for two or three cars in the other lane to go by, they drove up beside the car. They were going about thirty-five or forty miles an hour, and drove along beside him for about seven or eight-tenths of a mile. Mrs. Rutherford was on the passenger side; she was staring at him to see who he was. She could see him "real well." The driver at one point "just glanced at us" and then looked at the road. It was "a good day" and it was not snowing then. The driver's hair was "oily and ratty looking," about shoulder length. He had a beard. His hair and his beard were both "sandy reddish looking." He also wore glasses, and was the person whose photograph she had picked out. She had been told to "pick him out if he's there," and she had done so. There was "no question" in her mind that she had picked the right person. At the pre-trial identification hearing in May, she had identified the same person. She was aware that Mr. O'Pry was on trial for his life, but she was sure.

On cross-examination, Mrs. Rutherford said they had seen the car about fifteen or twenty miles past Ward's property. The driver was wearing "an army green coat" and some type of "dark" hat or cap. The coat was "kind of a light faded looking green jacket." His glasses were "horn rimmed" (she called all wire rimmed glasses horn rimmed). He was "sitting down low in the car; kind of slumped." He was "not especially husky, just like he had on a good many clothes." She and her husband thought about stopping and "calling the laws," but did not want to be called "nosy neighbors." They stopped later at a "little radio shack," and Ward's car passed them. It was headed toward Palestine, but was not speeding. After they had gotten home, around five p.m., Mr. Anderson called to tell them that Ward had been found dead. They called the police then.

Mrs. Rutherford was acquainted with Ward, but "didn't know him that well." She wore prescription sunglasses, and was wearing them on January 21. When she viewed the photo spread, she had "immediately discarded" the photos of men without beards. She had described a man with beard and glasses; she "knew who [she] was looking for." On re-direct, she answered "Yes" when asked if she were "absolutely certain" that O'Pry was the driver.

The State's last witness was Bobby Rutherford. He had known Durbin Ward for twenty years. He had seen Ward drive his car nearly every day; the photographs the prosecutor was showing him depicted Ward's car, "unless ya'll have tricked me." He confirmed that he and his wife had seen O'Pry driving Ward's car. When they saw the car, it was "just across" the Trinity River on Highway 84. Mr. Rutherford did not know, but he thought that it was about twelve miles to Ward's land. They had followed the car "for a good ways" and then drove along beside it for three or four hundred yards. Six-tenths of a mile might be about one thousand yards, but he "couldn't be looking directly right at the Defendant or whatever and look at the speedometer, too...." He did not have any trouble looking at the driver and watching out for on-coming cars at the same time; the road had been widened and there was plenty of room. He did not agree he was risking his and his family's lives because "my neck will bend, you know, and I can look here and I can look there." He drove far enough to get a "good look." O'Pry was wearing an "army fatigue" type jacket, "olive green looking," but he would not say it was an "army jacket." The man he saw was of "small stature," he "wasn't no 250 pound man." O'Pry "wasn't in any big hurry," which caused him to wonder. He had never seen any photo spread, but he had identified O'Pry at the hearing.

Rutherford did not know if he and Ward could be called "pretty good friends." Everybody was "a pretty good friend" to him until they did him wrong, and Durbin Ward never had. He was sorry to see him "pass away," but he would hate to see defense counsel pass away, too. The murder made him mad, but not as mad "as if you [defense

counsel] go on picking." He had discussed the case with the prosecutor before. Just before he testified, it was true, he had been talking to the prosecutor in the hall. He was not "just passing the time of day"; he knew what time it was. The prosecutor had told him, "Don't let him rile you up." He was not "riled up." He believed in law enforcement, but would not mis-identify anyone. He thought every man was "going to have to give an account one of these days," and he had told it "just like it is." With this the State rested its case.

Edward Jones testified for the defense. He worked in Tucker, eight miles west of Fairfield "on Highway 84 or 79." He did not know Ward "personally," but knew him when he saw him. He knew what his car looked like, and identified the State's photographs of it. On January 21, between 11:30 a.m. and 12:00 noon, Jones said, he had seen Ward's car "on the shoulder of the road west of where you turn to go in Mr. Ward's gate." The Trinity River was eighteen to twenty miles away from there. The car was headed east.

Jones knew that Ward was not the driver. The driver was "kind of bushy headed and bushy faced"; his hair and beard both looked "dark," about the color of the witness' hair (the record does not reflect what color Jones' hair was, but presumably it was not red). Jones admitted that he was "color blind in some locations of color." The defendant's hair was red to him; he would describe defense counsel's hair as "dark brown." (Again, no verification of this.)

On cross-examination, Jones agreed that "in relation to each other," his car and Ward's car were going sixty to seventy miles an hour. He only "glanced" at the driver, and did not "have time to really observe." He did not remember if the driver had a hat. He agreed that he really didn't have "the slightest idea" who was driving; he would not be able to point him out if he saw him.

Charles Bonner had known Ward for some thirty years. He sometimes hauled hay for the deceased, and kept some of his boy's cows on Ward's land. Since Ward's death, he had been on the property, "messing with cows." He was familiar with Mr. Ward's barn. It had two cribs in it. In the crib "on the western side or the side nearest to Fairfield," Bonner had found a "hay bed." This was "since the date of the murder." Some hay was "just raked up" and "they just made a bed right there where somebody had laid down and slept." The bed was not there on or before January 21. Bonner was not on the property on the twenty-first, but had gone out there since. On one occasion, there was no bed. But after that, there was (no dates asked for). If there was a hay bed on the twenty-first, "it was tore up between the time of then and when I fed hay out there," which was "within three or four days."

Bonner agreed that since Ward's death, he had had reason to feel "strange or suspicious." The evening he "opened that door, he felt "like the devil." Sometimes the door "would be open to the house or something"; it might have been the wind. Bonner had a key to the property, and one time after the murder he had found the gate unlocked. He guessed the sheriff or one of his men did that, but he believed somebody had been down there in the barn. The hay bed wouldn't have been big enough for him; it would be "for a small person." He thought someone had "curled up" in it, and "brought their legs on up like a baby was born."

The State recalled Deputy Nicholson, out of order. He said there was a "depression" in a stack of hay in the barn on January 21. The stack of hay was on the "southeast" side of the barn, the side closest to the house, toward Palestine.

The final witness in the case was Doctor Robert Sheldon, a psychiatrist. He had examined the defendant before trial. In his opinion, O'Pry was legally sane now and on January 21, and was competent to stand trial. Even so, O'Pry was suffering from a personality disorder; he had a "schizoid" personality, signifying "a person who is very shy." A person who showed no emotion when stopped by five armed policemen with high intensity spotlights would "probably" be of the schizoid type.

Jermiah B. O'Pry did not testify.[1]

■ The rules governing circumstantial evidence cases are familiar. Since each case must necessarily be tested on its own facts, we must carefully scrutinize all the evidence, as we hope our detailed exposition of the facts here reveals. A conviction cannot be sustained unless the circumstances exclude every reasonable hypothesis except that of guilt; proof amounting only to a strong suspicion is insufficient. *Flores v. State,* 551 S.W.2d 364, 367 (Tex.Cr.App. 1977). On the other hand, however, each fact need not "point directly and independently to the defendant's guilt," and the cumulative force of all the circumstances can support a finding of guilt. *Flores,* supra, at 367. Finally, and most important in this case, "[t]he rules of circumstantial evidence do not require that the circumstances should, to a moral certainty, actually exclude *every hypothesis* that the act may have been committed by another person, but the hypothesis intended is a *reasonable* one consistent with the circumstances and facts...." *Id.* at 367 (Emphasis added).

■ Our first question, then, is whether the evidence excludes every reasonable hypothesis except that appellant murdered Durbin Ward.[2] In this connection, the State showed the following:

1. Durbin Ward was killed at his farm on January 21, 1978, sometime between 9:00 a.m. and 3:30 p.m.;

2. At 11:15 a.m. that day, appellant was seen driving Ward's car, heading east, and about twenty miles from the farm;

3. At about 1:00 p.m. that afternoon, Ward's brother-in-law went to the farm to investigate and found tracks in the mud of only one vehicle entering and leaving;

4. Between 3:00 and 4:00 p.m., appellant pawned a .30–30 rifle and a .22 rifle in a pawn shop in Euless, giving a false address;

5. A .22 caliber bullet, identified as "long rifle" ammunition, was found in a sleeve of Ward's coat, and could have been fired from the .22 appellant pawned;

6. At about 3:30 p.m., Ward's body was found sitting in a chair in his house, with no blood trail inside or outside, and with no sign of any struggle;

7. Ward's wallet containing his driver's license,[3] which he carried in his front pocket, was gone, as was his pocket knife, which he habitually carried with him;

8. Appellant and a person whom appellant identified as a hitchhiker were apprehended about 1:00 a.m., on the morning of January 22, 1978, about 20 miles south of Waco;

9. At that time, appellant was driving Ward's car, and had Ward's pocket knife in his pocket;

10. Also at that time, a .22 "long rifle" bullet was found on the back floorboard (appellant had been seen lying on the back seat of an "older car" outside the pawn shop);

11. When appellant was searched, large quantities of hay fell out of each layer of his clothing, consistent with the body "indentation" found in a crib of Ward's barn;

---

1. Over the objection of the prosecutor that it didn't seem "quite fair," O'Pry did take the stand out of the presence of the jury to inform the court that he had made a voluntary decision, on the advice of his attorneys, not to testify.

2. The untenable argument made below that appellant would have used a .30–30 if he really "intended" to kill is not pressed on appeal; we do not understand appellant to say here that intent to kill under Section 19.02(a)(1) was not established, but only that the evidence does not show he was the killer.

3. This wallet was apparently never recovered, and is not to be confused with the wallet found in the glove compartment, which contained the safe-driving award. We also note here that no testimony was adduced as to where Ward kept his car keys, or whether he was in the habit of leaving them in his car. There was testimony by one witness that he had never seen anybody but Ward driving Ward's car.

12. Appellant had relatively little money when arrested and no permanent address (according to one portion of his statement, he himself had been hitchhiking earlier);

13. A car appellant identified as his was found about six miles from Ward's farm, where it appeared to be bogged down in mud;

14. In his statement,[4] appellant claimed to have bought Ward's car in Dallas on the day of the offense.

Against these facts, appellant does not undertake to formulate a specific hypothesis as to who else might have committed the offense. Instead, he relies on *Flores v. State,* supra, where we said that we knew of no case "where recent unexplained possession by an accused of a victim's stolen property is sufficient *by itself* to sustain a conviction for murder." (Emphasis added) In one of two supplemental briefs, moreover, appellant argues that *Flores* may not be distinguished from his case by the fact that he was identified driving Ward's car near his farm less than two and a half hours after Ward was last seen alive. For, according to appellant, *"[m]ere presence* at the scene of the crime *alone* is not sufficient to conclude that the accused committed the offense beyond a reasonable doubt." *Wright v. State,* 603 S.W.2d 838, 840–41 (Tex.Cr.App.1980) (Emphasis added).

In *Flores,* however, the evidence revealed that the victim might have been killed anytime within a period of twenty-six *days;* here we know that Ward was killed before 3:30 p.m., on January 21, 1978, less than ten hours before appellant was apprehended in his car. *Cf. Flores* at 368. Moreover, no possible murder weapon was located or connected with Flores, unlike the case here. Finally, as appellant concedes, there is evidence here to place him at the scene of the crime, unlike the case in *Flores.* For us to conclude that he committed the robbery, but not the murder, we would have to speculate that Ward left not only his wallet, but also his pocket knife (apparently his *vade mecum* ), in the car, and that appellant stole these along with the car, either before or after the murder, but prior to 11:15 a.m. that day. Either this, or that appellant came on Ward's body, and was simply a corpse-robber and a car thief.

These are alternative hypotheses, but we do not consider them *reasonable* ones. The jury would not have been unreasonable in believing that Ward would not have left his knife behind. The jury was entitled to doubt whether it was reasonable to assume that both a thief and a killer were present on Ward's farm that day—a cold day, with snow on the ground. The jury was entitled to believe that it would be too much of a coincidence that appellant would, that very day, pawn a gun that, consistent with the evidence, could have been the murder weapon. And finally, the jury heard no evidence that anyone else had a motive to kill Ward;[5] if someone else did, his motive was not robbery, for nothing was missing save the property found in appellant's possession. (Unless it be further assumed that he took Ward's empty wallet, leaving the pocket knife for appellant). Faced with many facts tying appellant to the offense, but with only the unlikely supposition of a motive-less killer, we, like the jury, believe that the evidence excludes every other reasonable hypothesis except that appellant intentionally killed Durbin Ward, and we so hold.

Appellant also contends, however, that the evidence is insufficient to show that he

---

4. Although the State introduced this statement into evidence, it was not thereby bound to disprove it because the statement did not "amount to an admission plus an assertion that would exculpate the accused from the crime charged." *Palafox v. State,* 608 S.W.2d 177, 181 (Tex.Cr.App.1979). On the other hand, the jury was, of course, free to believe any, all, or none of the statement, as with any other evidence.

5. Innuendo at trial to the contrary, we do not see any reasonable link between Zane Schoonover and the crime. Schoonover had no hay in his clothes and was never placed at Ward's farm; he had none of Ward's property in his possession, and was, by appellant's admission, simply a hitchhiker.

committed the murder during the course of committing a robbery. According to appellant, the facts raise a reasonable hypothesis that:

> "[T]he killer, possibly an itinterant [sic], slept in Decedent's barn (S.F. 71), was confronted by Decedent on the morning of the killing, shot the Decedent in the arm, the Decedent went into his house, the assailant became frightened, and followed Decedent into the house to "silence him forever" then, as an after thought, the assailant could have panicked and taken the Decedent's old car for purposes of escape. The low market value of the vehicle and the fact that Decedent carried very little money indicate a lack of reasonable motive for robbery. The fact that the arm wound entered from front to rear while the head wound entered from rear to front indicates that Decedent was shot in two different postures, and perhaps in two different locations. The fact that Decedent was elderly and somewhat weak indicates that assault was not necessary to force acquiesense [sic] to a theft. All of these questions remain unanswered from the evidence and leave open several possible and plausible explanations of the sequence of events on Durbin Ward's ranch on January 21, 1978."

While we agree with appellant that proof of a robbery committed as an "afterthought" and unrelated to a murder would not suffice, See *Riles v. State*, 595 S.W.2d 858, 862 (Tex.Cr.App.1980), appellant's hypothesis is not reasonable and is inconsistent with the evidence. The medical testimony indicated that if Ward had been shot outside, there would have been a blood trail; even if snow had covered the blood outside, there would have been blood on the floor. Moreover, if a person is fleeing from an attempt to "silence him forever," he does not rush into his living room and sit down in a chair next to his fireplace to await the *coup de grace*. Officer Nicholson found no signs of a struggle, and the positioning of Ward's body does not accord with appellant's theory.[6]

Moreover, neither *Palafox v. State*, 608 S.W.2d 177 (Tex.Cr.App.1979), nor *Cruz v. State*, 629 S.W.2d 852 (Tex.App.—Corpus Christi, 1982), cited by appellant, support his position. In *Palafox*, the State introduced defendant's confession into evidence. In his confession, Palafox admitted killing his ex-father-in-law, but claimed that he had subsequently removed numerous items of the victim's property only to make it appear that the murder was part of a burglary. *Id.* at 179. We reversed because the State, having introduced the confession, was thereby bound to disprove it, but did not. Here, of course, the State was not similarly obligated. See Footnote 4, supra.

Beyond this, the evidence in *Palafox* at least raised the possibility of another motive for the murder besides robbery: The deceased had disapproved appellant's marriage with his daughter, and had "exchanged words" with appellant after a separation had taken place. *Id.* at 180. Similarly, in *Cruz v. State*, supra, the court of appeals noted that robbery was not the only reasonable explanation for the homicide there. As the court pointed out, the defendant and the victim had been roommates and, "[w]here a person shoots his housemate, there are many plausible explanations other than that he killed with the intent to take the deceased's tangible personal property." *Cruz*, supra, at 860. In addition, a portion of appellant's statement, which he introduced, alleged that he had killed his roommate only after the roommate had cursed him and swung at him with a hammer. *Id.* Under the circumstances of that particular case, the court

---

**6.** Other assumptions in appellant's hypothesis are also weak. Ward may have been known to carry little money, but no evidence showed appellant knew that. The "low market value" of Ward's car (appellant does not cite to the record) does not negate the intent to steal; criminals have been known to settle for less than a Rolls-Royce, especially if their own cars are bogged down in mud. Finally, the fact that a victim is "elderly and somewhat weak" may indeed make force unnecessary; so is murder. The problem with appellant's theory here, as with so many theories, is reality.

was correct in holding that mere possession of the deceased's watch some 24 hours after the killing was "not enough to prove that the killing was done with the intent to obtain that property." [7] *Id.* at 859.

In this case, however, we see no evidence of any previous relationship between appellant and Durbin Ward, and appellant's statement, unlike those in *Palafox* and *Cruz,* does not raise any hypothesis to account for the killing. On the other hand, the evidence reveals that appellant was a transient of sorts, and that he had relatively little money when apprehended. He had a car, but the car may have been bogged in the mud (we find no evidence of its market value). He took not only the car, but also Ward's knife. He pawned two rifles the day of the murder, indicating some need for money.[8] Given this, as well as the failure of the evidence to suggest any other reasonable hypothesis, we conclude that the State made a sufficient showing that the murder was committed in the course of a robbery. *See and compare Autry v. State,* 626 S.W.2d 758, 762–763 (Tex.Cr.App.1982). (Defendant's hypothesis that he might have killed the store clerk "out of revenge" was "simply not supported by the record.")

■ In his five remaining grounds of error, appellant attacks the jury charge. In ground of error number four, he maintains that the application paragraph of the charge is fundamentally defective because it charges the jury on a theory of capital murder not alleged in the indictment. The paragraph applying the law to the facts reads:

"Now if you find from the evidence beyond a reasonable doubt that on or about the 21st day of January, 1978, in Freestone County, Texas, the Defendant, Jermiah H. O'Pry, did, with intent to deprive Durbin E. Ward, the owner, of corporeal personal property, to-wit, knife, wallet and automobile, without the effective consent of the owner, acquire said knife, wallet and automibile [sic] belonging to Durbin E. Ward, and that the Defendant, in so doing, if he did, and with intent to acquire and maintain control of said property, intentionally caused bodily injury to Durbin E. Ward, to-wit, death, by shooting Durbin E. Ward with a gun, intending thereby to kill the said Durbin E. Ward, then you will find the Defendant guilty of capital murder, as charged in the indictment."

The indictment, on the other hand, alleges that appellant "did then and there intentionally cause the death of an individual, Durbin E. Ward, by shooting him with a gun; and the said Jermiah B. O'Pry did then and there intentionally cause the death of the said Durbin E. Ward in the course of committing the offense of robbery."

According to appellant, the charge authorized the jury to find him guilty under Section 19.02(a)(*2*) of the Penal Code,[9] rather than under 19.02(a)(*1*), as alleged in the indictment, because of the words, "intentionally caused bodily injury." Conveniently, however, appellant ignores the words following those to which he objects: "intentionally caused bodily injury to Durbin E. Ward, *to-wit, death,* by shooting Durbin E. Ward with a gun, *intending thereby to kill the said Durbin E. Ward....*" (Emphasis added)

The State submits, for its part, that the words "bodily injury" are simply used as an "adjective" to describe the noun, "death." Be that as it may, the words "intending thereby to kill" show that the jury was required to find that appellant intentionally

7. We are not faced with the question of whether the intent to kill must coincide with the intent to steal (which might arise, for example, if a person entered a convenience store with larcenous intent, saw that the clerk was an old enemy, and killed him).

8. It will be remembered that Ward carried no folding money, according to his wife. Also, while pawning the .22 might have been one way of disposing of a murder weapon, it also brought the appellant some money—and he kept the pawn ticket.

9. Section 19.02(a)(2) authorizes a conviction for murder if the defendant "intends to cause serious bodily injury and commits an act clearly dangerous to human life that causes the death of an individual."

caused Ward's death, as alleged in the indictment. It is obvious that the court was not charging under Section 19.02(a)(2) (the charge does not require "*serious* bodily injury"), but was merely setting out all the elements of robbery under Section 29.-02(a)(1) of the Code.[10] We see no error, much less fundamental error.

The final grounds of error all relate to the court's charge on the lesser included offense of murder. After charging the jury on capital murder, the court continued as follows:

"Unless you so find beyond a reasonable doubt, or if you have reasonable doubt thereof, you will acquit the Defendant of capital murder, and consider whether the Defendant is guilty of felony murder.

"If you find from the evidence beyond a reasonable doubt that on or about the 21st day of January, 1978, in Freestone County, Texas, the Defendant, Jermiah B. O'Pry, did intentionally cause the death of another person, Durbin E. Ward, by shooting him with a gun, but you have a reasonable doubt as to whether the Defendant was then and there engaged in the commission of robbery of Durbin E. Ward at the time of said shooting, if any, then you will find the Defendant guilty of murder.

"You are further instructed that a person also commits murder if he commits a felony, other than manslaughter, and in the course of and in furtherance of the commission, or in immediate flight from the commission, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual.

"So, in this case, if you find from the evidence beyond a reasonable doubt that on the occasion and at the time and place in question the Defendant did rob Durbin E. Ward of his knife, wallet and automobile, as aforesaid, and in the furtherance

thereof, or in immediate flight from the commission, the Defendant did commit an act clearly dangerous to human life, to-wit, shoot a gun at Durbin E. Ward, and did therey cause the death of Durbin E. Ward by shooting him with a gun, but you have a reasonable doubt as to whether Defendant specifically intended to kill Durbin E. Ward by shooting him with a gun, then you will find the Defendant guilty of murder."

As can be seen, the court not only charged the jury under 19.02(a)(1) of the Code (intentionally causing death), but also under Section 19.02(a)(3) (felony murder). Appellant maintains that since capital murder under Section 19.03 first requires proof of murder under Section 19.02(a)(*1*), "there is no opportunity for the State to allege other forms of murder as a basis for capital murder and thus as a lesser included offense of capital murder." He asks the court to "clarify" our decision in *Ex parte McClelland,* 588 S.W.2d 957 (Tex.Cr.App. 1979), where we held that murder could be a lesser included offense of capital murder, so that only Section 19.02(a)(1) murder could be charged as a lesser included offense. In any event, he observes, the indictment in his case did not allege murder under 19.02(a)(3), but only under 19.02(a)(1).

In response, the State spends a great deal of time trying to demonstrate that Section 19.02(a)(3) murder may be a lesser included offense of capital murder pursuant to Article 37.09, V.A.C.C.P. In so doing, the State apparently misses both of appellant's points. As we understand it, appellant is saying that Section 19.03 by its very terms precludes the submission of murder on any theory save that in Section 19.02(a)(1), regardless of whether Section 19.02(a)(3) murder might be a lesser included offense of capital murder. More importantly, appellant is also saying that where an indictment alleges one offense in order to allege a

---

**10.** Section 29.02(a)(1) includes the requirement, *inter alia,* that the offender intentionally (or knowingly or recklessly) cause "bodily injury" in the course of committing theft. We note that a trial court would do well to avoid setting out all of the elements of theft in this situation,

lest one element be left out. *See Hill v. State,* 640 S.W.2d 879 (Tex.Cr.App.1982). Instead, we recommend the charge set forth at pages 72–74 of McClung's Jury Charges for Texas Criminal Practice (Revised edition, January 1, 1981).

greater offense, as here, the alleged statutory mode of committing the *lesser* offense limits any charge on the lesser offense. Put simply, the contention is that if the indictment alleges 19.02(a)(1) murder, a charge under 19.02(a)(3) produces a fatal variance. *See and compare Colbert v. State,* 615 S.W.2d 754 (Tex.Cr.App.1981) (Indictment for murder under Section 19.-02(a)(1); conviction for voluntary manslaughter reversed where charge on voluntary manslaughter encompassed both 19.-02(a)(1) murder, as alleged, and 19.02(a)(2) murder, not alleged).

 We need not decide these issues here, however, because appellant was convicted of *capital* murder, not murder. As the State observes, once the jury convicted appellant of capital murder, having been properly charged as to that offense, it had no occasion to consider whether appellant might be guilty of felony murder. We find no support for appellant's assertion that "having read the entire charge, as directed, the jury could not avoid a lay opinion that all theories of murder mentioned in the charge were subject to their consideration whether on the issue of 'felony' murder or capital murder." As indicated above, the charge specifically required that the jury find that appellant intended to kill Ward before they could convict him of capital murder. Moreover, if the jury acted "as directed," as we presume they did, they stopped after finding appellant guilty of capital murder, because they did not have a reasonable doubt that would require them to consider further.

In our view, in short, any error in the submission of a charge under Section 19.-02(a)(3) was not reversible in light of the jury's verdict. Instead, we find that this case is governed by *Thomas v. State,* 587 S.W.2d 707 (Tex.Cr.App.1979) and *DeRusse*

*v. State,* 579 S.W.2d 224 (Tex.Cr.App.1979). In *Thomas,* we held that where the appellant had been convicted of attempted murder, any error in the charge on the lesser included offense of aggravated assault did not constitute fundamental error. *Id.* at 708–709. Similarly, in *DeRusse,* supra, the court refused to reverse a conviction for murder despite the appellant's argument that injury to a child was not a lesser included offense of murder, and thus should not have been charged. *Id.* at 233. The same logic applies here,[11] and appellant's contentions are overruled.

Finding no error [12] calling for a reversal of the conviction, we deny appellant's motion for rehearing. The State's motion for rehearing is granted, our previous order of reversal is set aside, and the trial court's judgment is affirmed.

---

11. We are aware that both *Thomas* and *DeRusse* involved claims of fundamental error, while in this case appellant made a timely objection to the charge. Nevertheless, we do not deem the error, if any, reversible.

12. In the grounds of error just discussed, appellant also objects to the use of the word "attempt" in the felony murder charge, arguing that the indictment did not allege any "attempt" and that the evidence did not raise the issue. We reject this contention for the same reasons given above, and note that the word "attempt" does not appear in that portion of the charge on capital murder.