

# NUMBER 13-10-00205-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

---

**JOSE ALBERTO RAMIREZ,**                            **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                 **Appellee.**

---

### On appeal from the 275th District Court
### of Hidalgo County, Texas.

---

# MEMORANDUM OPINION

### Before Chief Justice Valdez and Justices Rodriguez and Garza
### Memorandum Opinion by Justice Rodriguez

Appellant Jose Alberto Ramirez challenges his conviction by a jury for capital murder, for which he was sentenced to life in prison. *See* TEX. PENAL CODE ANN. §§ 12.31(a), 19.03(a)(2) (West Supp. 2010). By five issues, Ramirez challenges the sufficiency of the evidence supporting his conviction, the admission of a crime scene

video tape and certain photographs at trial, information on mandatory punishment given to the panel during jury selection, and the trial court's comment on the case and/or evidence during jury selection. We affirm as modified.

## I. Background

Ramirez was indicted as follows for capital murder:

[O]n or about [April 15, 2008], . . . [Ramirez] did then and there intentionally cause the death of an individual, namely, Gabriel Garcia, by striking Gabriel Garcia with a metal canister, and the defendant was then and there in the course of committing or attempting to commit the offense of robbery of Gabriel Garcia.

*See id.* § 19.03(a)(2). Ramirez pleaded not guilty, and the case was tried to a jury.

The following facts from trial are undisputed. Ramirez and Garcia were sexually involved. On the night Garcia was killed, he and Ramirez had engaged in oral sex in Garcia's apartment. Garcia was several inches taller and approximately fifty pounds heavier than Ramirez. Ramirez does not deny that he went to Garcia's apartment with a metal $CO_2$ canister from a paintball gun and that he struck Garcia on the head multiple times with the metal canister, but claimed at trial that he did so in self-defense as Garcia was attacking him and attempting to sexually assault him. Garcia died from blunt force trauma wounds to the head. Ramirez does not dispute that he committed theft. He took some items from Garcia's apartment—such as a portable video game and Garcia's watch and wallet—but left others—such as other jewelry and larger electronic equipment. Ramirez claimed at trial that he never intended to rob Garcia and that he took the items as an afterthought.

After the close of evidence, the jury found Ramirez guilty of capital murder. The State did not seek the death penalty, and the trial court sentenced Ramirez to life

imprisonment without parole.   This appeal followed.

## II.   Sufficiency of the Evidence

By his first issue, Ramirez argues that the evidence at trial was insufficient. Specifically, Ramirez argues that:   (1) the State did not adequately rebut his self-defense theory and the evidence was therefore insufficient to support the jury's rejection of this defensive theory; and (2) there was no evidence proving that Ramirez committed the murder in the course of robbing Garcia.[1]

## A.   Standard of Review and Applicable Law

In a sufficiency review, courts examine the evidence in the light most favorable to the verdict to determine whether "any rational fact finder could have found guilt beyond a reasonable doubt."   *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) ("[T]he *Jackson* legal-sufficiency standard is the only standard that a reviewing court should apply in determining whether the evidence is sufficient to support each element of a criminal offense that the State is required to prove beyond a reasonable doubt.").   This standard requires reviewing courts to resolve any evidentiary inconsistencies in favor of the judgment, keeping in mind that the jury is the exclusive judge of the facts, the credibility of the witnesses, and the weight to give their testimony.   *Brooks*, 323 S.W.3d at 899; *see* TEX. CODE CRIM. PROC. ANN. art. 38.04 (West 1979) ("The jury, in all cases, is the exclusive judge of the facts proved, and of the

---

[1] With regard to both of his sufficiency arguments, Ramirez asserts that the State was bound to disprove beyond a reasonable doubt any exculpatory evidence contained within Ramirez's statement to the police.   This principle, referred to as the voucher rule, has been repudiated by the Texas Court of Criminal Appeals.   *See Russeau v. State*, 785 S.W.2d 387, 390 (Tex. Crim. App. 1990) (en banc) (holding that "the voucher rule was rejected with the enactment of Rule 607"); *see also* TEX. R. EVID. 607 ("The credibility of a witness may be attacked by any party, including the party calling the witness . . . .").   We are therefore not persuaded by Ramirez's sufficiency challenges to the extent he relies on this rule.

3

weight to be given to the testimony. . . ."). Appellate courts do not re-evaluate the weight and credibility of the evidence; they only ensure that the fact finder reached a rational decision. *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009).

Legal sufficiency is measured by the elements of the offense as defined by a hypothetically correct jury charge. *Villarreal v. State*, 286 S.W.3d 321, 327 (Tex. Crim. App. 2009); *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). "Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Villarreal*, 286 S.W.3d at 327; *see Malik*, 953 S.W.2d at 240. In this case, Ramirez committed the offense if he murdered Garcia as defined in section 19.02(b)(1) of the penal code and "intentionally commit[ed] the murder in the course of committing or attempting to commit . . . robbery." Tex. Penal Code Ann. § 19.03(a)(2). Under section 19.02(b)(1), murder is "intentionally or knowingly caus[ing] the death of an individual." *Id.* § 19.02(b)(1) (West 2003). A person commits robbery if "in the course of committing theft . . . and with intent to obtain or maintain control of the property . . . [he] intentionally, knowingly, or recklessly causes bodily injury to another." *Id.* § 29.02(a)(1) (West 2003). "A person acts intentionally, or with intent, with respect to the nature of his conduct or to a result of his conduct when it is his conscious objective or desire to engage in the conduct or cause the result." *Id.* § 6.03(a) (West 2003).

It is not necessary that the evidence directly proves the defendant's guilt; "[c]ircumstantial evidence is as probative as direct evidence in establishing the guilt of the actor, and circumstantial evidence alone can be sufficient to establish guilt." *Hooper v.*

4

*State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see Kuciemba v. State*, 310 S.W.3d 460, 462 (Tex. Crim. App. 2010). A fact finder may support its verdict with reasonable inferences drawn from the evidence, and it is up to the fact finder to decide which inference is most reasonable. *Laster*, 275 S.W.3d at 523.

## B. The Evidence

At trial, the State first called Leslie Lopez, who lived with her boyfriend in the apartment above Garcia's apartment. Lopez testified that on the night of the murder, they heard commotion coming from Garcia's apartment. Someone yelled "leave me alone" several times. Lopez called 911, and shortly after she called, she looked out the window and saw a man standing by a white car in the parking lot. Lopez testified that the man was on the passenger side of the car and fidgeting with some items in the car.

Next, several McAllen Police Department officers who responded to the scene testified. The officers testified that when they arrived at the apartment, they discovered the back window to be open. When they looked inside the window, they saw a man covered in blood lying on the bedroom floor. The officers forced their way into the apartment and discovered that the man lying on the floor was dead. That man was eventually identified as Garcia.

The McAllen Police Department detectives who investigated the incident testified that when they entered Garcia's apartment, there appeared to have been a disturbance. The living room was in disarray, and there were signs of a struggle in the bedroom. In the living room, the detectives observed that Garcia's DVD player was unhooked and hanging by its cord off the entertainment center; the television was sitting by the door and appeared as if someone was about to steal it. The detectives also testified about the

5

white car found in the parking lot outside Garcia's apartment. The car was registered to Saul Alvarado, who was determined to be Ramirez's roommate. Alvarado informed the detectives that he had sold the car to Ramirez. When the detectives were leaving Alvarado's house after questioning him, they encountered Ramirez walking down the street toward Alvarado's house. Ramirez told the detectives that he wished to report a stolen vehicle. He told the detectives that his car had been stolen from a movie theater parking lot. The detectives offered to drive Ramirez to the police station to make his report, and Ramirez agreed to go with the detectives.

On cross-examination, the detectives agreed that numerous items of value had been left in the apartment. They also agreed that, based solely on their observation of Garcia's bedroom, they could not determine with certainty the exact nature of the struggle that occurred.

Two McAllen Police Department crime scene investigators (CSIs) testified more specifically about the scene. After they received a warrant to search Ramirez's car, they found the following items on the floorboards: two wallets, one of which contained Garcia's driver's license; a credit card with Garcia's name on it; a Portable Play Station (PSP) hand-held video game; a watch; and a $CO_2$ canister from a paint ball gun. The CSIs testified that the following items had been left in the apartment: a Nintendo game console; a stereo and speakers; and a computer. They testified that when they swabbed Ramirez's mouth later at the police station, they noticed scratches on his hands and arms and a red stain on the back of his right tricep.

Alvarado testified that he was Ramirez's roommate. He testified that he did not believe Ramirez owned a PSP or a watch.

6

Norma Jean Farley, M.D., the forensic pathologist who conducted the autopsy on Garcia, testified that Garcia died of blunt force head trauma. She testified that the $CO_2$ canister found in Ramirez's car would have been capable of causing Garcia's head injuries. Dr. Farley also testified that Garcia had defensive bruises on his forearms. On cross-examination, Dr. Farley agreed that she never examined Ramirez to ascertain his injuries and could not testify as to the specifics of the altercation between Ramirez and Garcia.

McAllen Police Department Detective Steve Ayala testified that he interviewed Ramirez at the police station. Although Ramirez initially claimed that his car had been stolen, he eventually gave a statement describing his encounter with Garcia on the night of the murder. In his statement, Ramirez said that Garcia wanted to have a more serious relationship. Ramirez told Garcia he was not interested in a serious relationship and, at that point, attempted to get up and leave Garcia's apartment. Ramirez then described the chain of events as follows:

> And when I got up from the bed, he grabbed me by my arm and sat me back on the bed. I then asked him what was wrong with him, and I told him to leave me alone. Gabriel then started to hug me and I started to push him away, but he then hit or scratched me on my left eye. I started to push Gabriel, and he started to scratch me on my arms.

> I then punched him on the shoulder, and he tried to grab me again. I then went to my pants that were on the floor and took off the tank. I then started to hit him on the head with it. I hit him about 10 to 15 times on the head, and he got to hit me once on the face.

> . . . .

> When I hit him the last time, he fell to the ground and I thought he had fainted. I then hit him one more time on the head and I went to the restroom. In the restroom, I went to bath – bathroom tub and I started to clean the blood I had on my arms and on the tank.

7

Next, Ramirez explained that after he put the canister, his wallet, and cell phone in his car, he returned to the apartment to check on Garcia. Ramirez stated that Garcia was not moving. Ramirez then left the apartment through the back window when he heard a knock on the front door. Ramirez stated that he walked home and that is where he first encountered the police. He told the police that his car had been stolen from a movie theater parking lot. The police took Ramirez to the station to make a report about the stolen car, and while at the station, Ramirez gave the police the foregoing statement about the evening's events at Garcia's apartment.

Finally, the State called Michael Garcia, the deceased's brother. Michael testified that the watch recovered from Ramirez's car belonged to his brother. Michael also testified that the wallet and PSP recovered from the car belonged to his brother.

After the State rested, Ramirez testified on his own behalf. He testified that he met Garcia in an internet chat room, and the two arranged to meet for oral sex. The night of the killing was the second night Ramirez had gone to Garcia's apartment for sex. On that second night, Garcia and Ramirez argued about their relationship. Ramirez testified that Garcia became angry when Ramirez told him he did not want a serious relationship. According to Ramirez, Garcia picked him up and threw him on the bed. When Ramirez attempted to flee, Garcia grabbed him from behind in a bear hug. Garcia held Ramirez up; his feet were off the ground. Ramirez testified that he believed Garcia was going to sexually assault him or kill him. Ramirez testified that he got a hold of the $CO_2$ canister and began swinging back and hitting Garcia on the head with it. When defense counsel asked Ramirez "how is it that you were hitting him with this canister?", Ramirez replied,

8

"Here[,] where I would reach him in the back of the head." After hitting Garcia multiple times like this, Ramirez testified that Garcia fell back on the bed, still holding him. Garcia let Ramirez go, but when Ramirez stood up, Garcia hit him. Ramirez testified that he then hit Garcia several more times in the head with the canister until "he was knocked out." Ramirez then put on his clothes and went to the bathroom to wash the blood off his hands. He testified that he took his cell phone, wallet, and a watch and left the apartment. He returned to the apartment after putting the items in his car to "see if [Garcia] was okay." Ramirez testified that he did not intend to kill Garcia and had no plan to rob Garcia when he went to the apartment that night. Ramirez testified that he only struck Garcia because he was trying to protect himself.

On cross-examination, the State questioned Ramirez about two prior offenses: one conviction for theft and one conviction for making a false report to a police officer that his car had been stolen. Ramirez agreed that both offenses reflected poorly on his honesty. Ramirez also agreed that telling the police on the night of Garcia's murder about his car being stolen was not the first time he had lied to police officers.

## C. Self-Defense

Ramirez argues that the State "did not provide any credible evidence or argument to contradict" his self-defense contentions. For this reason, Ramirez argues that the evidence was insufficient to support the jury's rejection of his self-defense theory.

One may use force against another when and to the degree he reasonably believes the force is immediately necessary to protect himself against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31 (West Supp. 2010). This includes using deadly force against the other if the actor "reasonably believes" the deadly

9

force is immediately necessary to protect himself against the other's use or attempted use of unlawful deadly force. *Id.* § 9.32(a) (West Supp. 2010).

"The issue of self-defense is a fact issue to be determined by the jury, and a jury is free to accept or reject the defensive issue, even if the evidence is uncontroverted." *Hill v. State*, 99 S.W.3d 248, 252 (Tex. App.—Fort Worth 2003, pet. ref'd) (citing *Wilkerson v. State*, 881 S.W.2d 321, *324* (Tex. Crim. App. 1994)). When a jury finds a defendant guilty, there is an implicit finding against the defensive theory. *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2007). When reviewing the sufficiency of the evidence concerning the jury's rejection of self-defense, "we determine whether after viewing all the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of murder beyond a reasonable doubt and also would have found against appellant on the self-defense issue beyond a reasonable doubt." *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991) (en banc); *Lee v. State*, 259 S.W.3d 785, 791 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd).

Here, there was some evidence that Ramirez was defending himself from Garcia's unwanted advances. First, it is undisputed that Garcia was larger than Ramirez. Ramirez testified that Garcia attacked him and that he feared for his life. Ramirez testified that he swung back to hit Garcia with the canister as Garcia held him in a bear hug from behind. Ramirez's account of the events was not directly contradicted by other testimony or evidence at trial. Finally, one of the CSIs testified that Ramirez had scratches on his arms, which could have reasonably been inferred as defensive wounds.

But there was also evidence under which the jury could have rejected Ramirez's account. In his statement to police, Ramirez said that he continued to beat Garcia with

10

the canister even after he believed Garcia "had fainted." *See* TEX. PENAL CODE ANN §
9.32(a) (providing that the use of deadly force in self-defense is permissible only to the
extent the actor reasonably believes it is necessary to protect himself from the use of
deadly force). In fact, in his statement, Ramirez does not mention the bear hug he
described in his testimony at trial—he states only that he hit Garcia ten to fifteen times
with the canister after Garcia attacked him.

Dr. Farley, the forensic pathologist who performed the autopsy, testified that
Garcia had defensive bruises on his forearms, which is evidence contrary to Ramirez's
assertions that he swung back to hit Garcia as Garcia held him in a bear hug. *See id.*
Dr. Farley also testified that Garcia's head injuries were caused by significant force, from
which the jury could also have inferred that Ramirez was not striking Garcia from the
awkward position he claimed. *See Laster*, 275 S.W.3d at 523; *see also Dale v. State*, 90
S.W.3d 826, 833 (Tex. App.—San Antonio 2002, pet. ref'd) (reasoning that evidence of
the use of significant blunt force is physical evidence of an intent to kill).

Finally, the State called Ramirez's credibility into question by introducing prior
convictions in which he had lied to the police. *See Brooks*, 323 S.W.3d at 899 (holding
that the credibility of the witnesses is a matter committed solely to the province of the
jury). His credibility and consciousness of guilt were also raised by the evidence
showing that Ramirez lied to the detectives about his car being stolen. *See King v.
State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (holding that circumstantial evidence
indicating a consciousness of guilt, such as false statements about the crime or an
attempt to cover it up, are relevant to show intent); *Torres v. State*, 794 S.W.2d 596,
598-600 (Tex. App.—Austin 1990, no pet.) (same).

11

We conclude that the jury acted rationally in rejecting Ramirez's self-defense theory and that the evidence was sufficient to show beyond a reasonable doubt that Ramirez intentionally caused the death of Garcia. *See Saxton*, 804 S.W.2d at 914; *Lee*, 259 S.W.3d at 791; *see also* TEX. PENAL CODE ANN. § 19.02(b)(1). Even though Ramirez's version of the events was not contradicted, the jury was free to disregard Ramirez's testimony and instead credit the evidence that weighed against self-defense and in favor of murder. *See Hill*, 99 S.W.3d at 252. We will not disturb the jury's weighing of the evidence on appeal.

## D. In the Course of Committing Robbery

Ramirez next argues that the evidence was insufficient to prove he committed the murder in the course of robbing Garcia. Ramirez argues that the evidence shows he took the several items he did as an afterthought and did not kill Garcia with the intent of robbing him.

As it applies to capital murder under penal code section 19.03(a)(2), the phrase "in the course of committing or attempting to commit" has been defined to mean "conduct occurring in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of the offense." *Riles v. State*, 595 S.W.2d 858, 862 (Tex. Crim. App. 1980) (en banc). "Proof of a robbery committed as an 'afterthought' and unrelated to a murder would not suffice." *O'Pry v. State*, 642 S.W.2d 748, 762 (Tex. Crim. App. 1982) (en banc). The State must prove a nexus between the murder and the theft, i.e., that the murder occurred to facilitate the taking of the property. *Ibanez v. State*, 749 S.W.2d 804, 807 (Tex. Crim. App. 1986).

Ramirez contends that the numerous items of value left in the apartment prove he

had no plan to rob Garcia.   Ramirez also contends that he did not bring items with him ordinarily used to facilitate a robbery, "such as a firearm, knife, other deadly weapon, nor duct tape, rope, gloves, or a duffel bag," and that this also shows he did not commit the murder in the course of committing or attempting to commit a robbery.

While the foregoing is indeed circumstantial evidence weighing against conviction, there was nonetheless circumstantial evidence that the jury could have reasonably credited in determining that Ramirez did commit the murder in the course of robbing or attempting to rob Garcia.   Although the evidence showed that Ramirez left numerous items of value in the apartment, it is undisputed that he did take Garcia's PSP, wallet, and watch.   There was testimony that Garcia's DVD player had been unhooked and was hanging by its cord from the entertainment center and that his television was sitting on the floor by the door.   The jury could have rationally inferred that Ramirez returned to the apartment to take more property, but when he heard a knock at the front door, he fled out of fear of being caught by the police.   Especially in light of his flight from the scene, the jury was also free to disbelieve Ramirez's explanation that he returned to the apartment to check on Garcia's condition.   And again, the State called Ramirez's credibility into question, and the jury could have concluded that he was not a trustworthy witness.

In short, as with Ramirez's self-defense theory, the jury acted within its province in disregarding Ramirez's version of the events regarding the robbery.   We conclude that there was sufficient circumstantial evidence to show a nexus between the murder and the taking of the property; a rational jury could have inferred that the taking of the property was more than an afterthought.

13

### E. Summary

Having concluded that the evidence was sufficient both to support the jury's rejection of Ramirez's self-defense theory and the jury's determination that Ramirez committed the murder in the course of robbing or attempting to rob Garcia, we overrule Ramirez's first issue.

### III. Admission of Evidence

In two issues, Ramirez argues that the trial court erred in admitting certain evidence at trial.

### A. Standard of Review

The standard of review for the admissibility of evidence is abuse of discretion. *Martin v. State*, 173 S.W.3d 463, 467 (Tex. Crim. App. 2005) (en banc). Under an abuse of discretion standard, we will uphold the decision of the trial court concerning the admissibility of evidence unless the ruling rests outside the zone of reasonable disagreement. *Id.*

### B. Crime Scene Video Tape

By his second issue, Ramirez challenges the admission of a DVD video recording of the crime scene. Ramirez asserts that the DVD was a duplicate of the original video recording and was not properly authenticated by the State, and the trial court therefore abused its discretion in admitting it. *See* TEX. R. EVID. 901. However, assuming without deciding that the trial court so erred, we are not persuaded by Ramirez's argument that the error is reversible because he has provided no explanation of how the admission harmed him.

In this case, any error in the admission of the DVD would not have been

14

constitutional error and is therefore subject to rule 44.2(b)'s harm standard. *See Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002) (applying rule 44.2(b) to the erroneous admission of evidence); *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001) (same); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998) (same); *see also* TEX. R. APP. P. 44.2(b). Under rule 44.2(b), we disregard any error that did not affect the defendant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A defendant's substantial rights were not affected by the erroneous admission of evidence "if the appellate court, after examining the record as a whole, has fair assurance that the error did not influence the jury, or had but a slight effect." *Motilla*, 78 S.W.3d at 355 (internal quotation omitted).

In his brief, Ramirez makes no argument regarding harm. Absent an explanation regarding the harm caused by the DVD's admission, we cannot conclude that the error, if any, was reversible. Ramirez's second issue is overruled.

## C. Autopsy Photographs

By his fourth issue, Ramirez argues that the trial court erred in admitting four photographs from Garcia's autopsy. Ramirez argues that the photographs were more prejudicial than probative and thus inadmissible. We disagree.

Rule 403 provides that, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." TEX. R. EVID. 403. The rule creates a presumption of admissibility of all relevant evidence and authorizes the trial court to exclude such evidence only when there is a "clear disparity between the degree of prejudice of the offered evidence and its probative value." *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999). In analyzing whether evidence is

15

more prejudicial than probative, the court should consider: (1) how probative the evidence is; (2) the potential of the evidence to impress the jury in some irrational and indelible way; (3) the time needed by the proponent to develop the evidence; and (4) the proponent's need for the evidence. *Reese v. State*, 33 S.W.3d 238, 240-41 (Tex. Crim. App. 2000). Under the fourth factor, one relevant inquiry is whether the fact of consequence meant to be established by the evidence is in dispute. *Id.* at 242.

> Generally, a photograph is admissible if verbal testimony as to matters depicted in the photographs is also admissible. [*Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997)]; *Long v. State*, 823 S.W.2d 259, 271-72 (Tex. Crim. App. 1991). In other words, if verbal testimony is relevant, photographs of the same are also relevant. Texas Rule of Evidence 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." A visual image of the injuries appellant inflicted on the victim is evidence that is relevant to the jury's determination. The fact that the jury also heard testimony regarding the injuries depicted does not reduce the relevance of the visual depiction.
>
> . . . .
>
> A court may consider several factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice. These factors include, but are not limited to: the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black and white or color, whether they are close-up, and whether the body depicted is naked or clothed. [*Williams*, 958 S.W.2d at 196]. The availability of other means of proof and the circumstances unique to each individual case must also be considered. *Id.*

*Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007).

Here, the complained-of photographs showed Garcia's brain after the scalp had been pulled back and the skull opened. The photographs were admitted through the testimony of Dr. Farley, who testified that the photos depicted the brain injuries, such as brain swelling, that Garcia suffered as a result of the blunt force head trauma. Ramirez

16

timely and adequately objected to the admission of the photographs and questioned Dr. Farley on voir dire, in relevant part, as follows:

> [Defense counsel]: And you can explain the injuries to the jury without showing these photographs, correct?
>
> [Dr. Farley]: Yes.
>
> [Defense counsel]: Okay. There's no need to show this to the jury. You can explain the severity of the injuries, how they caused the death without displaying these to the jury; is that correct?
>
> [Dr. Farley]: I can explain it, but that shows – if there's a difference, I can explain it, but sometimes . . . they don't understand it without a visual, kind of — if you explain the brain is swelling.

After argument by defense counsel and the State, the trial court then admitted the photos.

Ramirez contends that the photographs were not relevant to any disputed issue at trial, as he never contested the cause of death or the type of injuries Garcia suffered, and the photographs were therefore "not probative of any issue that was in dispute." However, other factors weighed heavily in favor of the photographs' admission. The complained-of photographs constituted only four of over thirty autopsy photographs admitted by the State and described by Dr. Farley at trial. Our review of the record also shows that the State did not emphasize these four photos any more than the other autopsy photos. Further, although the photographs were gruesome, Dr. Farley's testimony made it clear that the refracted scalp and skull were a result of the autopsy, and there was no danger those aspects of the photos would be attributed to any act by Ramirez. *See Gallo*, 239 S.W.3d at 763. Finally, the photographs depicted the extent of Garcia's brain injuries, which was probative of Ramirez's state of mind and refuted his

17

defensive theory that he swung back awkwardly to hit Garcia with the $CO_2$ canister.   *See Dale*, 90 S.W.3d at 833 (reasoning that evidence of significant blunt force trauma is physical evidence of an intent to kill).

Ramirez also contends that the photographs were more prejudicial than probative in that they "were not used in any meaningful way to assist Dr. Farley in her testimony." The record demonstrates otherwise.   As visual depictions of the injuries Dr. Farley was describing, the photographs were highly relevant.   *See Gallo*, 239 S.W.3d at 762.   Dr. Farley stated as much in response to defense counsel's questioning when she said that jurors often need a visual to help them understand the verbal medical explanation given by the pathologist.

In sum, we conclude that the complained-of photographs helped the jury understand the extent of Garcia's injuries, were demonstrative of Ramirez's intent, and did not constitute a large part of Dr. Farley's testimony and the State's case.   The photographs were highly relevant and probative and not unfairly prejudicial.   The trial court therefore did not abuse its discretion in admitting them.   Ramirez's fourth issue is overruled.

### IV.   Jury Instruction

By his third issue, Ramirez argues that the trial court failed to properly inform the jury panel during voir dire regarding the mandatory punishment for capital murder and that this error was reversible.   In a capital murder trial where the State does not seek the death penalty, as was the case here, section 12.31 of the penal code requires prospective jurors to be informed that the State is not seeking the death penalty and that a sentence of life imprisonment without parole is mandatory on conviction.   *See* TEX. PENAL CODE ANN.

18

§ 12.31(b)(2) (West Supp. 2010). Ramirez complains of the following statement to the jury panel by a prosecutor during voir dire:

> Now, in a capital murder case, the State being the office of the Criminal District Attorney, Mr. Rene Guerra, will decide there's only two punishments available. There's either death or *life with parole*.
>
> And Mr. Guerra will decide if he's going to seek the death penalty or if he's going to seek life without parole. In this case, the State is seeking life without parole. We're not seeking the death penalty in this case.

(Emphasis added.)

Even assuming that the prosecutor's misstatement amounted to error, Ramirez made no objections that the State misinformed the jury about the mandatory punishment. He has therefore preserved nothing for our review. *See* TEX. R. APP. P. 33.1(a); *see also Anderson v. State*, No. 01-94-00568-CR, 1995 WL 717033, at \*5 (Tex. App.—Houston [1st Dist.] Dec. 7, 1995, pet. ref'd) (not designated for publication) (holding that where the appellant failed to object to the trial court's failure to follow section 12.31, nothing was preserved for review). We overrule Ramirez's third issue.

## V. Comment on the Case and/or Evidence

By his fifth issue, Ramirez complains of a line of questioning during voir dire in which the State asked the jury panel if they could convict someone of capital murder based on the testimony of only one witness. Ramirez argues that the trial court improperly commented on the case and/or the evidence when it made the following statement related to those questions:

> Ladies and gentlemen, let me address you on this point. This is the nature of the beasts [sic], people. Like the example that [the prosecutor] gave you is that you personally saw somebody break into your car, and there's no other witness. Okay. This is the law. All right. One witness is sufficient to convict.

19

If you are just trying to get out of a jury panel, it's not going to work because I'm going to send you to another courtroom. Now, let's be fair here, answer honestly and follow the law, please. Let's proceed.

Again, even assuming that the trial court made an improper comment, Ramirez failed to object to it. And absent a timely and specific objection to the improper comment, any error was waived. *See* TEX. R. APP. P. 33.1(a); *Sharpe v. State*, 648 S.W.2d 705, 706 (Tex. Crim. App. 1983) (holding that any error in trial court's comments to jury is waived absent an objection). We overrule Ramirez's fifth issue.

## VI. Modification of Judgment

The trial court's judgment mistakenly states that Ramirez was convicted under section 19.03(a)(3) of the penal code. *See* TEX. PENAL CODE ANN. § 19.03(a)(3) (West Supp. 2010) (providing that a person commits capital murder if he commits murder "for remuneration or the promise of remuneration or employs another to commit the murder for remuneration or the promise of remuneration"). However, Ramirez was convicted of capital murder pursuant to section 19.03(a)(2). *See id.* § 19.03(a)(2) (providing that a person commits capital murder if he commits murder and "intentionally commits the murder in the course of committing or attempting to commit kidnapping, burglary, robbery, aggravated sexual assault, arson, obstruction or retaliation, or terroristic threat"). The Texas Rules of Appellate Procedure give this Court authority to modify judgments sua sponte to correct typographical errors and make the record speak the truth. TEX. R. APP. P. 43.2; *French v. State*, 830 S.W.2d 607, 609 (Tex. Crim. App. 1992); *Rhoten v. State*, 299 S.W.3d 349, 356 (Tex. App.—Texarkana 2009, no pet.); *Gray v. State*, 628 S.W.2d 228, 233 (Tex. App.—Corpus Christi 1982, pet. ref'd). Therefore, we modify the

20

judgment to indicate that the statute under which Ramirez was convicted is section 19.03(a)(2) of the penal code. *See* TEX. PENAL CODE ANN. § 19.03(a)(2); *see also* TEX. R. APP. P. 43.2; *French*, 830 S.W.2d at 609; *Rhoten*, 299 S.W.3d at 356; *Gray*, 628 S.W.2d at 233.

## VII.  Conclusion

The judgment of the trial court is affirmed as modified.


NELDA V. RODRIGUEZ
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the 19th
day of January, 2012.